**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 6, 2009

Charles R. Fulbruge III
Clerk

No. 08-10738

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

JUAN VALENZUELA-CONTRERAS

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas
No. 4:07-CR-20

Before KING, HIGGINBOTHAM, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

In March 2006, defendant-appellant Juan Valenzuela-Contreras shot and killed Vernon Harris during a dispute over payment for marijuana. When police subsequently arrested Valenzuela in his home, they seized, *inter alia*, heroin, cocaine, marijuana, and numerous firearms. Valenzuela pleaded guilty to Harris's murder in state court, and a federal jury subsequently found Valenzuela guilty of: (1) possession of heroin with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (count one); (2) possession of cocaine with the

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (count two); and (3) possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c) (count three). Though Valenzuela was never charged with possession of marijuana with intent to distribute, the presentence report stated that the marijuana transaction involving Harris was relevant conduct pursuant to United States Sentencing Guideline § 1B1.3 and that Harris's murder was a harm resulting therefrom, also in accordance with § 1B1.3. The district court agreed and therefore cross referenced the murder pursuant to § 2D1.1(d)(1), ruling that Valenzuela's total offense level was 43. Valenzuela never objected to his sentence.

Valenzuela timely appealed, arguing that the district court plainly erred when it determined that the marijuana transaction and murder were relevant conduct pursuant to § 1B1.3. For the following reasons, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

On or before March 20, 2006, Juan Valenzuela-Contreras "fronted"[1] approximately 25 pounds of marijuana to Pablo Escobar. Escobar fronted the marijuana to Vernon Harris. On March 20, 2006, Valenzuela, Escobar, and Federico San Vallejo traveled to Harris's residence in Dallas, Texas, in order to collect part of the $8,000 that he owed to Valenzuela as payment for the marijuana originally fronted to Escobar. Harris said that he did not have the money and refused to sign over his Ford Expedition as payment. Valenzuela then shot Harris at least three times in the body and head. Valenzuela, Escobar, and Vallejo fled the scene before police arrived. The following day, Harris died from the gunshot wounds.

---

[1] "Fronting" is the advancing of drugs before payment is made.

Escobar subsequently told law enforcement officers that Valenzuela had shot Harris. Dallas officers identified Valenzuela's residence at 5301 Greenwood Way in North Richland Hills, Texas. The police received information that Valenzuela used the residence to stash drugs, and a state warrant was later obtained for Valenzuela's arrest.

As the officers were preparing to execute the warrant, they saw Edgar Delgado and Vallejo exiting the residence. The two men were detained, and soon thereafter the police found Valenzuela in the residence. After the officers obtained a search warrant to search the residence, they seized, *inter alia*, heroin, marijuana, cocaine, three digital scales, drug ledgers, $24,461 in U.S. currency, and a 9mm pistol. Valenzuela was arrested on the outstanding state murder warrant and for possession of cocaine and heroin with the intent to distribute. A forensic chemist later determined that the police had seized 654.8 net grams of heroin (charged in count one), 368.5 net grams of cocaine (charged in count two), and 150.3 net grams of marijuana (not charged).

During a post-arrest interview, Valenzuela admitted his involvement in the murder and gave a detailed explanation about what occurred at Harris's residence. He stated that Escobar had asked to borrow $8,000, which Escobar, in turn, planned to lend to Harris. Valenzuela said that he, Escobar, and Vallejo had gone to Harris's residence to collect $4,000 of the $8,000 debt that was due, but that Harris did not have the money. He admitted that he pulled a handgun from his waistband and shot Harris three or four times after Harris started pushing him. Valenzuela also acknowledged that Harris did not have a weapon and that the 9mm pistol that was found at the residence was the weapon he used to shoot Harris.

Valenzuela was later interviewed by agents from the Drug Enforcement Administration. Valenzuela admitted, *inter alia*, that: (1) the drugs seized from his residence belonged to him; (2) he was being paid $1,000 per week to allow a

3

known drug dealer to store the drugs at his residence; (3) the drug dealer had dropped off drugs at his residence three or four times; (4) each time the amount of drugs consisted of less than one kilogram of cocaine or heroin; (5) he had as much as $20,000 at a time in the residence; (6) the drug dealer's brother-in-law would store six or seven ounces of hydroponic marijuana at the residence; and (7) the drugs were only stored at the residence and were not sold from there.

## B. Procedural Background

In state court, Valenzuela pleaded guilty to Harris's murder. At sentencing, Vallejo testified that: (1) Harris's murder was a drug-related killing; (2) Valenzuela fronted the marijuana to Escobar who, in turn, fronted the drugs to Harris; and (3) Valenzuela killed Harris because Harris failed to pay the money that he owed to Valenzuela for the marijuana. In federal court, on March 31, 2008, after Valenzuela pleaded not guilty, a jury found him guilty of: (1) possession of heroin with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (count one); (2) possession of cocaine with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (count two); and (3) possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c) (count three).

The presentence report ("PSR") initially calculated a guideline offense level of 32 (151–188 month sentence) due to Valenzuela's possession of heroin, cocaine, and marijuana on March 21, 2006. The report then cross referenced Harris's murder under U.S.S.G. § 2D1.1(d)(1), arriving at a total offense level of 43 with a criminal history category of I. Specifically, the PSR stated that both Harris's murder and Valenzuela's marijuana transaction with Escobar and Harris were relevant conduct under § 1B1.3:

> Pursuant to USSG § 1B1.3(a)(1)(A)&(2), Valenzuela-Contreras'
> drug-related activities in reference to Escobar and Harris are
> considered relevant conduct and all part of the same course of
> conduct or common scheme or plan as the offense of conviction. In

4

addition, Valenzuela-Contreras' murder of Harris was a harm that resulted from the acts and omissions of his relevant conduct and Harris' murder was a harm that was the object of his (Valenzuela-Contreras') drug-related activities. USSG § 1B1.3(a)(3).

(PSR at ¶ 21.) The court ordered a 474-month term of imprisonment as to count one, a 240-month term as to count two to run consecutively to the sentence imposed for count one, and a 60-month term as to count three to run consecutively to the sentences imposed as to counts one and two (a total of 774 months). The court further ordered that Valenzuela's sentence run concurrently with the sentence that he was serving for his state conviction. Notably, Valenzuela made no objection to his sentence.

Valenzuela timely appealed his sentence. He primarily argues that his marijuana transaction was not relevant conduct under § 1B1.3(a)(2) and thus that Harris's murder was not a "harm" under § 1B1.3(a)(3).

## II. STANDARD OF REVIEW

Generally, this court reviews a district court's interpretation and application of the United States Sentencing Guidelines (the "Guidelines") de novo and its factual findings for clear error. *See United States v. Juarez-Duarte*, 513 F.3d 204, 208 (5th Cir. 2008). Because Valenzuela did not object to the district court's application of the cross reference, we review for plain error. *United States v. Simmons*, 568 F.3d 564, 566 (5th Cir. 2009) ("If . . . the procedural objection was not presented in the district court, our review is for plain error only."). "If an error is not properly preserved, appellate-court authority to remedy the error . . . is strictly circumscribed." *Puckett v. United States*, 129 S. Ct. 1423, 1428 (2009). Under this standard, we reverse if there is an error that "is plain and affects substantial rights." *United States v. Olano*, 507 U.S. 725, 732 (1993) (internal quotation marks and alteration omitted). "[T]he legal error must be clear or obvious, rather than subject to reasonable dispute." *Puckett*, 129 S. Ct. at 1429. If we determine that such error exists, we

5

"may then exercise [our] discretion to notice a forfeited error but only if . . . the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton*, 535 U.S. 625, 631 (2002) (internal quotation marks and alterations omitted).

## III. DISCUSSION

Section 2D1.1 of the Guidelines governs sentencing for drug trafficking and therefore applies to Valenzuela's sentence for his heroin and cocaine convictions. Subsection (d)(1), entitled "Cross References," provides that "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111,"[2] courts should apply § 2A1.1 "if the resulting offense level is greater than that determined under this guideline." Section 2A1.1 establishes the base offense level for first degree murder at 43. In the present case, the district court applied this § 2D1.1(d)(1) cross reference in order to establish Valenzuela's base offense level at 43. Valenzuela now challenges the application of this cross reference.

"[W]hether [the § 2D1.1(d)(1)] cross-reference should be applied depends on whether the conduct to which the cross-reference refers is 'relevant conduct'" pursuant to § 1B1.3. *United States v. Pauley*, 289 F.3d 254, 258 (4th Cir. 2002). In relevant part, subsection (a) states:

> [C]ross references in Chapter Two . . . shall be determined on the basis of the following:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . .

> . . .

---

[2]  18 U.S.C. § 1111 defines murder as "the unlawful killing of a human being with malice aforethought."

6

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions . . . .

U.S.S.G. § 1B1.3(a). Thus, the central question before us is whether the district court plainly erred when it ruled that Valenzuela's marijuana transaction and Harris's murder were relevant conduct under § 1B1.3.

Before proceeding with our analysis, we find it necessary to clarify the PSR's sentencing calculation because Valenzuela incorrectly characterizes it in his brief.[3] First, the PSR states that, "[p]ursuant to USSG § 1B1.3(a)(1)(A) & [§ 1B1.3(a)(2)], Valenzuela-Contreras' drug-related activities in reference to Escobar and Harris [i.e., the fronting of marijuana] are considered relevant conduct and all part of the same course of conduct or common scheme or plan as the offense of conviction." Thus, the PSR "grouped" only the marijuana—not the murder itself—as a countable offense pursuant to § 1B1.3(a)(2). Second, the PSR states that, under § 1B1.3(a)(3), Harris's murder "was a harm that resulted from the acts and omissions of his relevant conduct and Harris' murder was a harm that was the object of his (Valenzuela-Contreras') drug-related activities." In other words, the PSR reasoned that the marijuana transaction constituted relevant conduct under § 1B1.3(a)(1)(A) and (a)(2) and that—because Valenzuela killed Harris over a dispute about the marijuana—the murder was a

---

[3] Valenzuela wrongly suggests that the PSR "grouped" Harris's murder as relevant conduct pursuant to § 1B1.3(a)(2).

corresponding "harm" under (a)(3).[4]    Finally, the PSR states that the
§ 2D1.1(d)(1) murder cross reference applied to Valenzuela's sentence and thus
established a base offense level of 43.

The district court did not err when it first grouped Valenzuela's marijuana
transaction as relevant conduct pursuant to § 1B1.3(a)(2).[5]    Indeed, the
marijuana was groupable under § 1B1.3(a)(2) as an act caused by the defendant
alongside other "counts involving substantially the same harm"—i.e., the counts
for heroin and cocaine possession with intent to distribute—under § 3D1.2(d).
Commentary in the Guidelines provides that, "in a drug distribution case, . . .
types of drugs not specified in the count of conviction are to be included in

---

[4] Valenzuela persuasively argues that § 1B1.3(a)(1)(A) does not apply because neither the marijuana transaction nor Harris's murder occurred during, in preparation for, or in the course of attempting to avoid detection or responsibility for the offenses of conviction. The government appears to concede that Valenzuela is correct. Regardless, the PSR did not solely base its sentencing enhancement on this provision; it also cited to § 1B1.3(a)(2) as grounds for considering the marijuana as relevant conduct. We address the applicability of this provision below.

[5] Valenzuela argues that § 1B1.3(a)(2) and (a)(3) incorporate the "occurred during the commission" language that exists at the end of § 1B1.3(a)(1). In other words, he contends that § 1B1.3(a)(2) and (a)(3) do not apply for the same reason that § 1B1.3(a)(1)(A) does not apply: the killing of Harris did not occur during, in preparation for, or in the course of attempting to avoid detection or responsibility for the offenses of conviction.

Valenzuela's interpretation is unavailing. The plain language of § 1B1.3(a)(2) only refers to (1)(A) and (1)(B), not the "occurred during the commission" language which belongs more generally to § 1B1.3(a)(1). Otherwise, (a)(2) would have referred broadly to section (a)(1). Furthermore, as the government notes, the commentary accompanying § 1B1.3 contemplates scenarios in which acts and omissions that are part of the "same course of conduct or common scheme or plan" may be included under § 1B1.3(a)(2) but do not occur during, in preparation for, or in the course of attempting to avoid detection or responsibility for the offense of conviction. U.S.S.G. § 1B1.3 cmt. n.3 ("For example, where the defendant engaged in three drug sales of 10, 15, and 20 grams of cocaine, as part of the same course of conduct or common scheme or plan, subsection (a)(2) provides that the total quantity of cocaine involved (45 grams) is to be used to determine the offense level even if the defendant is convicted of a single count charging only one of the sales."). Similar reasons undermine Valenzuela's argument that the "occurred during the commission" language limits § 1B1.3(a)(3). Most importantly, the plain language of this section refers to *both* (a)(1) and (a)(2), suggesting that acts under (a)(2)—which itself does not include the "occurred during the commission" language—may be considered regardless of the specific timing of the act or omission.

determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." U.S.S.G. § 1B1.3 cmt. background. Furthermore, "[t]ypes . . . of drugs not specified in the count of conviction may be considered in determining the offense level." U.S.S.G. § 2D1.1 cmt. n.12. This court has previously ruled that "it is permissible for a sentencing court to consider a defendant's transactions in one type of drug even if his conviction was for conspiracy involving a different type of drug . . . assuming that those transactions otherwise satisfy the criteria for relevant conduct prescribed by the guidelines." *United States v. McCaskey*, 9 F.3d 368, 375 (5th Cir. 1993). In the present case, it was permissible for the district court to consider Valenzuela's marijuana transaction alongside his convictions for possession of heroin and cocaine. Indeed, the PSR is clear that Valenzuela trafficked in marijuana, as he fronted 25 pounds of marijuana to Escobar and killed Harris when Harris refused to pay for it. Furthermore, marijuana is explicitly linked with Valenzuela's offenses of conviction, as more marijuana was found in Valenzuela's residence along with heroin and cocaine. Finally, Valenzuela admitted to storing marijuana in his residence and never objected to the inclusion of marijuana in his sentencing calculation. The district court thus did not err when it determined that "drug-related activities in reference to Escobar and Harris" were "relevant conduct and all part of the same course of conduct or common scheme or plan as the offense of conviction" pursuant to § 1B1.3(a)(2).

Furthermore, the district court did not err when it reasoned pursuant to § 1B1.3(a)(3) that Harris's murder was a harm resulting from the marijuana transaction. In his primary briefing before this court, Valenzuela does not directly challenge the district court's application of this specific provision.[6] This

---

[6] Valenzuela argues in a 28(j) letter that the district court plainly erred in ruling Harris's murder was relevant conduct under § 1B1.3(a)(3). Specifically, he argues that the

9

court has not precisely defined what may constitute harm under this provision, though it has noted that the provision contains neither a culpability requirement, *see United States v. Mitchell*, 366 F.3d 376, 379 (5th Cir. 2004), nor a foreseeability requirement, *see United States v. Blakey*, No. 92-9093, 1993 WL 307926, at \*2 (5th Cir. July 29, 1993). Though other circuits have already found that this provision contains a "causation requirement," *see, e.g.*, *United States v. Hicks*, 217 F.3d 1038, 1048 (9th Cir. 2000) ("[T]he term 'resulted from' establishes a causation requirement."), we need not do so here because Harris's murder was a harm that resulted from Valenzuela's marijuana transaction, a transaction that itself was relevant conduct under § 1B1.3(a)(2).

Because the district court properly reasoned that the marijuana transaction and Harris's murder were relevant conduct pursuant to § 1B1.3, it did not err, plainly or otherwise, when it applied the § 2D1.1(d)(1) murder cross reference to Valenzuela's sentence.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM Valenzuela's sentence.

---

court erred because Harris's murder was related to other relevant conduct under § 1B1.3(a)(2) (the marijuana transaction) and not to the offenses of conviction (the heroin and cocaine possession). As support for this argument, he cites to the Seventh and District of Columbia Circuits, both of which have allegedly prohibited this sort of "daisy-chain reasoning." *See United States v. Bullock*, 454 F.3d 637, 642 (7th Cir. 2006) (ruling it "not good enough" that conduct be "relevant only by association with other relevant conduct," and that instead "the connection to the offense of conviction has to be direct."); *United States v. Pinnick*, 47 F.3d 434, 439 (D.C. Cir. 1995) ("[T]he government must demonstrate a connection between count three [offered as relevant conduct] and the offense of conviction, not between count three and the other offenses offered as relevant conduct."). However, both circuits ruled that conduct is not relevant under § 1B1.3(a)(2) when it is solely related to *other relevant conduct under (a)(2)*. *See* THOMAS W. HUTCHISON ET AL., FEDERAL SENTENCING LAW AND PROCEDURE § 1B1.3 (9th ed. 2009). In the present case, by contrast, the plain language of § 1B1.3(a)(3) explicitly recognizes that Harris's murder may be relevant conduct because it is a harm that resulted from relevant conduct under (a)(2). U.S.S.G. § 1B1.3(a)(3) (including as relevant conduct "all harm that resulted from the acts and omissions specified in subsection[] . . . (a)(2) above, and all harm that was the object of such acts and omissions").