# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 18-20689

United States Court of Appeals
Fifth Circuit

**FILED**
September 13, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

MERCY O. AINABE,

Defendant–Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, DENNIS, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Mercy Ainabe was convicted of several health-care-related offenses in connection with recruiting and transporting individuals to Texas Tender Care (TTC) for treatment. At sentencing, the district court considered Ainabe's similar conduct at two other companies—Gulf EMS, LLC (Gulf) and Gifter Medical Services (Gifter)—and considered the amounts billed by all three of these companies in calculating the "loss" for sentencing purposes. Ainabe challenges the district court's application of (1) a two-level enhancement under § 2B1.1(b)(2)(A)(i) of the Guidelines for offenses involving more than ten victims; (2) an eighteen-level increase under § 2B1.1(b)(1)(J) for losses of more than $3.5 million; and (3) an increase of three levels under § 2B1.1(b)(7)(B)(ii)

No. 18-20689

for a loss to a government healthcare program of more than $7 million. We affirm.

## I

Gulf, an ambulance service owned and operated by Mercy Ainabe and her husband, began operating in 2003. Gulf transported residents from group homes to and from partial hospitalization programs (PHPs).

Gulf falsely classified those group-home patients to justify their transportation via ambulance. Gulf submitted billings to Medicare for those transportation expenses, even though it often double-loaded residents into a single ambulance or transported them in private vehicles. Gulf also transported ambulatory dialysis patients and submitted false claims stating the patients were non-ambulatory. Gulf submitted approximately $4.3 million in claims from January 2007 through April 2010. Medicare paid approximately $1.1 million on the claims submitted by Gulf.

In April 2010, Ainabe enrolled Gifter as a Medicare provider. Although Gifter claimed to be a diagnostic testing company, evidence suggests that, like Gulf, it transported patients to and from PHPs. For example, Gifter received checks from a PHP identified as "Pristine Healthcare" under the name "Gifter Transport," and Ainabe signed a certification stating that Gifter was "bringing . . . patients to [Pristine] for their group therapies and medical treatments." A Medicare contractor audit determined that Gifter presented false claims. From October through December of 2010, Gifter submitted approximately $300,000 in claims to Medicare. Medicare paid approximately $200,000 on those claims.

In September or October of 2010, Ainabe contacted Magdalene Akharamen, a social acquaintance who owned TTC, a home healthcare agency. Ainabe told Akharamen that "what she [Ainabe] does is refer patients to

agencies," including home healthcare agencies and PHPs, and that she had "been doing this recruiting business for a while." Ainabe explained "the way she operated" to Akharamen. Ainabe said she referred patients to a provider and paid for all of the services received by the patients (nursing services, physician services, etc.). The provider then billed Medicare. When the provider was paid by Medicare, it reimbursed Ainabe for the payments she had made. The remaining funds from the Medicare payment—the "profit," as Akharamen described it—were then split evenly between Ainabe and the provider.

Akharamen agreed to this arrangement, and Ainabe began working with TTC. Ainabe caused TTC to grow "a lot." Ainabe recruited patients for TTC from group homes even though many of those patients did not qualify for home healthcare services. Further, many of the services for which TTC billed Medicare were never actually provided to patients. Between August 2011 and August 2015, TTC billed Medicare approximately $3.6 million for home healthcare services. Medicare paid approximately $3.2 million on those claims.

The Government charged Ainabe with seven counts stemming from her relationship with TTC: one count of conspiracy to commit healthcare fraud,[1] five counts of healthcare fraud,[2] and one count of conspiracy to pay healthcare kickbacks.[3] A jury convicted Ainabe on all counts.

Based on the information contained in a Presentence Report (PSR), the district court applied several sentencing enhancements. Over Ainabe's objections, the district court added (1) two levels under § 2B1.1(b)(2)(A)(i) of the Guidelines because the offense involved more than ten victims; (2) eighteen

---

[1] 18 U.S.C. §§ 1347, 1349.

[2] 18 U.S.C. §§ 2, 1347.

[3] 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b(b)(1), (b)(2).

No. 18-20689

levels under § 2B1.1(b)(1)(J) because the loss was more than $3.5 million; (3) three levels under § 2B1.1(b)(7)(B)(ii) because there was more than $7 million in loss to a government healthcare program; and (4) two levels under § 3B1.3 because Ainabe's criminal conduct violated the public trust.[4]  With a base offense level of six and a criminal history category of I, those enhancements brought Ainabe's Guidelines range to 108 to 135 months of imprisonment.[5]  The district court sentenced Ainabe to 108 months.

Ainabe appeals, contending that the district court erred when it imposed the enhancements because it (1) used an incorrect definition of victims, (2) considered Ainabe's actions on behalf of Gulf and Gifter as relevant conduct, and (3) relied on the amounts billed to Medicare to calculate intended loss.

## II

Ainabe argues that the district court erred when it concluded that her offense involved ten or more victims and consequently merited a two-level enhancement under § 2B1.1(b)(2)(A)(i).[6]  According to Ainabe, her offense did not involve ten or more victims because the many Medicare beneficiaries implicated in her offense "did not spend any of their own money on their care." However, as Ainabe concedes, that argument is foreclosed by *United States v. Barson*, which held that "Application Note 4(E) of U.S.S.G. § 2B1.1 defines 'victim' in a way that encompasses . . . Medicare beneficiaries because it includes 'any individual whose means of identification was used unlawfully or

---

[4] *See* U.S. SENTENCING GUIDELINES MANUAL §§ 2B1.1(b), 3B1.3 (U.S. SENTENCING COMM'N 2016) [hereinafter U.S.S.G.].

[5] *Id.* ch. 5, pt. A.

[6] *Id.* § 2B1.1(b)(2)(A)(i) ("If the offense . . . involved 10 or more victims . . . increase by 2 levels . . . .").

No. 18-20689

without authority.'"[7]  Therefore, the district court did not err when it imposed the two-level enhancement under § 2B1.1(b)(2)(A)(i).

## III

The district court imposed an eighteen-level enhancement pursuant to § 2B1.1(b)(1)(J) of the Guidelines based on its conclusion that the relevant conduct involved a "loss" of more than $3.5 million.[8]  The district court also imposed a three-level enhancement under § 2B1.1(b)(7)(B)(ii) based on its conclusion that the relevant conduct involved a "loss" of more than $7 million to a government healthcare program.[9]  In reaching those conclusions, the district court considered the amounts billed to Medicare by TTC (approximately $3.6 million), Gulf (approximately $4.3 million), and Gifter (approximately $300,000).

Ainabe contends that the district court erred by considering the frauds perpetrated in conjunction with Gulf and Gifter as relevant conduct.  Section 1B1.3(a)(2) of the Guidelines provides that the "relevant conduct" that a district court should consider when applying the Guidelines includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."[10]  "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by *at least one common factor*, such as common victims, common accomplices, common purpose, or similar *modus operandi*."[11]

---

[7] 845 F.3d 159, 167 (5th Cir. 2016) (per curiam) (quoting U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. n.4(E) (U.S. SENTENCING COMM'N 2009)).

[8] *See* U.S.S.G. § 2B1.1(b)(1)(J).

[9] *Id.* § 2B1.1(b)(7)(B)(ii).

[10] *Id.* § 1B1.3(a)(2).

[11] *Id.* § 1B1.3 cmt. n.5(B)(i) (emphasis added); *see United States v. Buck*, 324 F.3d 786, 796 (5th Cir. 2003); *see also United States v. Ochoa–Gomez*, 777 F.3d 278, 282 (5th Cir. 2015)

No. 18-20689

The district court found that "the fraudulent claims submitted to Medicare by Gulf EMS and Gifter were part of the same scheme or plan as the offenses of conviction."  A district court's determination of what constitutes relevant conduct for sentencing purposes, including what acts and omissions are part of a common scheme or plan as the offense of conviction, is a factual finding that this court reviews for clear error.[12]  "A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole."[13]

Ainabe stresses two types of factual differences among the three frauds: the services provided by the companies and the time periods during which the fraudulent claims were submitted.  She also argues that the district court improperly considered evidence beyond what was introduced at trial.

**A**

Gulf was an ambulance company, Gifter purported to provide diagnostic testing, and TTC was a home healthcare agency.  However, the fraud accomplished through each company began with Ainabe's contacts at group homes, PHPs, and home healthcare agencies.  Gulf submitted fraudulent bills for transporting residents of group homes to PHPs.  The record indicates that Gifter also submitted fraudulent bills for transporting patients to PHPs for group therapy.  TTC, a home healthcare agency, similarly benefited from Ainabe's relationship with group homes, the source of many of the unnecessary referrals to TTC.  Each business submitted fraudulent bills for Medicare services purportedly provided to Medicare beneficiaries recruited through

("The application notes accompanying a Guideline generally bind federal courts unless they are inconsistent with the text of the Guideline.").

[12] *Buck*, 324 F.3d at 796 (citing *United States v. Nevels*, 160 F.3d 226, 229 (5th Cir. 1998)).

[13] *United States v. Cooper*, 274 F.3d 230, 238 (5th Cir. 2001) (citing *United States v. Puig–Infante*, 19 F.3d 929, 943 (5th Cir. 1994)).

No. 18-20689

Ainabe's connections with group homes then pocketed the difference between the amount reimbursed by Medicare and the amount it had paid for the services actually provided.  Given these similarities, it is at least plausible that the three frauds were "substantially connected to each other by at least one common factor, such as common victims, . . . common purpose, or similar *modus operandi*."[14]  Therefore, the district court did not clearly err when it found that Gulf, Gifter, and TTC submitted fraudulent claims to Medicare as part of a common scheme or plan.

## B

Ainabe also insists that her actions on behalf of Gulf and Gifter do not have the requisite temporal proximity to qualify as relevant conduct.  The district court concluded that the frauds perpetrated at Gulf and Gifter were relevant conduct under § 1B1.3(a)(2), which instructs district courts to consider "all acts and omissions described in subdivisions 1(A) and 1(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction."[15]  Ainabe seems to argue that § 1B1.3(a)(2) incorporates the last segment of § 1B1.3(a)(1), thereby limiting the acts that can be considered under § 1B1.3(a)(2) to those "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."[16]

We rejected this argument in an unpublished opinion.  In *United States v. Valenzuela–Contreras*, we noted that "[t]he plain language of § 1B1.3(a)(2) only refers to (1)(A) and (1)(B), not the 'occurred during the commission'

---

[14] U.S.S.G. § 1B1.3 cmt. n.5(B)(i).
[15] *Id.* § 1B1.3(a)(2).
[16] *Id.* § 1B1.3(a)(1).

No. 18-20689

language which belongs more generally to § 1B1.3(a)(1).  Otherwise, (a)(2) would have referred broadly to section (a)(1)."[17]  We also noted that "the commentary accompanying § 1B1.3 contemplates scenarios in which acts and omissions that are part of the 'same course of conduct or common scheme or plan' may be included under § 1B1.3(a)(2) but do not occur during, in preparation for, or in the course of attempting to avoid detection or responsibility for the offense of conviction."[18]  The reasoning in *Valunezuela–Contreras* is cogent and persuasive because it is supported by the text of the Guidelines, and we apply that reasoning here.

Accordingly, the fact that the Gulf and Gifter frauds may not have occurred during, in preparation for, or in the course of attempting to avoid detection or responsibility for the fraud perpetrated by Ainabe and TTC did not foreclose the district court from concluding that the fraud perpetrated by Ainabe in concert with two other companies was part of a common scheme or plan.  Rather, the timing of the fraudulent schemes is a fact to be considered when determining whether they were sufficiently similar to the TTC scheme to be part of a common scheme or plan.  Here, the three frauds were closely related in time: Ainabe enrolled Gifter with Medicare in April 2010, when Gulf stopped submitting fraudulent claims; and Ainabe contacted Akharamen about working with TTC in September or October of 2010, while Gifter was submitting fraudulent claims.  Given these circumstances, the fraudulent

---

[17] 340 F. App'x 230, 235 n.5 (5th Cir. 2009) (per curiam).

[18] *Id.* (citing U.S. SENTENCING GUIDELINES MANUAL § 1B1.3 cmt. n.3 (U.S. SENTENCING COMM'N 2007)); *see also* U.S.S.G. § 1B1.3 cmt. n.5(A) ("For example, where the defendant engaged in three drug sales of 10, 15, and 20 grams of cocaine, as part of the same course of conduct or common scheme or plan, subsection (a)(2) provides that the total quantity of cocaine involved (45 grams) is to be used to determine the offense level even if the defendant is convicted of a single count charging only one of the sales.").

No. 18-20689

claims submitted by Gulf and Gifter are sufficiently similar to qualify as relevant conduct for sentencing purposes.

## C

Ainabe also argues that the evidence introduced at trial did not establish that any fraud ever occurred at Gulf or Gifter.  However, at sentencing, district courts are not limited to the evidence introduced at trial.[19]  Rather, they can consider any evidence with a "sufficient indicia of reliability to support its probable accuracy," including non-conclusory statements in a PSR.[20]  Ainabe did not challenge the reliability of the information regarding Gulf and Gifter included in the PSR.  Therefore, Ainabe's argument fails.

## IV

Ainabe maintains that the district court erred when it relied on the amount billed by Gulf, Gifter, and TTC to calculate "loss."  For the purposes of § 2B1.1 of the Guidelines, "loss is the greater of actual loss or intended loss"[21]— "that is, the greater of the pecuniary harm that foreseeably resulted or that was intended to result from the offense."[22]  The Guidelines include a specific note on calculating intended loss for federal healthcare offenses involving government healthcare programs:

> In a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie

---

[19] *See United States v. Malone*, 828 F.3d 331, 336-37 (5th Cir. 2016).

[20] *United States v. Zuniga*, 720 F.3d 587, 590-91 (5th Cir. 2013) (per curiam) (quoting *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (per curiam)).

[21] U.S.S.G. § 2B1.1 cmt. n.3(A).

[22] *United States v. Harris*, 821 F.3d 589, 602 (5th Cir. 2016) (citing U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. n.3(A) (U.S. SENTENCING COMM'N 2014)); *see* U.S.S.G. § 2B1.1 cmt. n.3(A)(i), (ii).

No. 18-20689

evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted.[23]

Ainabe contends that evidence that Gulf only received $1.1 million after billing $4.3 million to Medicare sufficiently rebuts the presumption established by the Guidelines. According to Ainabe, "the fact that Medicare paid $1.1 million on $4.3 million in billings for Gulf EMS shows that Ainabe knew that only [some] portion of the billed amount would be paid."

When reviewing a district court's conclusion as to the amount of intended loss, this court "first determine[s] whether the trial court's method of calculating the amount of loss was legally acceptable."[24] We review the district court's choice of a method for calculating the intended loss de novo "because that is an application of the guidelines, which is a question of law."[25] However, the appropriate method of calculating the amount of intended loss is determined by the facts of the case,[26] and "clear error review applies to the background factual findings that determine whether . . . a particular method is appropriate."[27]

In this case, the district court determined that the appropriate method for calculating the intended loss was to add together the total amounts billed

---

[23] U.S.S.G. § 2B1.1 cmt. n.3(F)(viii); *see United States v. Isiwele*, 635 F.3d 196, 203 (5th Cir. 2011) ("[T]he amount fraudulently billed to Medicare/Medicaid is 'prima facie evidence of the amount of loss [the defendant] intended to cause,' but 'the amount billed does not constitute conclusive evidence of intended loss; the parties may introduce additional evidence to suggest that the amount billed either exaggerates or understates the billing party's intent.'" (quoting *United States v. Miller*, 316 F.3d 495, 504 (4th Cir. 2003))).

[24] *United States v. Klein*, 543 F.3d 206, 214 (5th Cir. 2008) (quoting *United States v. Olis*, 429 F.3d 540, 545 (5th Cir. 2005)).

[25] *Id.* (citing *United States v. Saacks*, 131 F.3d 540, 542-43 (5th Cir. 1997)).

[26] *Isiwele*, 635 F.3d at 202.

[27] *Id.* (citing *United States v. Harris*, 597 F.3d 242, 251 n.9 (5th Cir. 2010)).

No. 18-20689

by Gulf, Gifter, and TTC. The district court's determination as to the appropriate means of calculating the intended loss was based on its implicit factual determination that Ainabe expected each company to be paid the full amount billed. We review that factual determination for clear error.[28] If we conclude that the district court's factual determination was not clearly erroneous, then we review de novo whether the district court applied the correct means of calculating the intended loss in light of that factual determination.[29]

The district court's factual determination that Ainabe expected each company to be paid the full amount that it billed was plausible and therefore not clearly erroneous.[30] As discussed, the Guidelines impose a presumption that Ainabe intended for each company to be paid the full amount that it billed, and Ainabe has the burden of rebutting that presumption.[31] Although Ainabe points to some evidence suggesting that she did not expect each company to receive the full amount billed—specifically the fact that Gulf only received about 25% of what it billed—that evidence does not conclusively establish that Ainabe did not expect each company to receive the full amount billed. Put another way, even after considering that evidence, it is nonetheless plausible that Ainabe intended for each company to receive the full amount billed.

Comparing the evidence in this case with the evidence before the court in *United States v. Isiwele* is instructive. In *Isiwele*, there was evidence that

---

[28] *Id.* (citing *Harris*, 597 F.3d at 251 n.9).

[29] *See Klein*, 543 F.3d at 214 (citing *Saacks*, 131 F.3d at 542-43).

[30] *See United States v. Cooper*, 274 F.3d 230, 238 (5th Cir. 2001) ("A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole." (citing *United States v. Puig–Infante*, 19 F.3d 929, 943 (5th Cir. 1994))).

[31] U.S.S.G. § 2B1.1 cmt. n.3(F)(viii).

11

the defendant knew Medicare paid on a fixed fee schedule for the services he provided but that he submitted claims for higher amounts "[knowing] he would receive these lower capped amounts."[32]  Accordingly, we remanded the case to the district court to consider whether that evidence rebutted the presumption that the amount billed equaled the intended loss.[33]  No such evidence is present in this case.  Instead, Ainabe relies on evidence that one company in one industry received less than it billed to establish that she expected another company in another industry to receive less than it billed.  Ainabe has pointed to no evidence explaining why Gulf received less than it billed.  Nor has she pointed to any evidence that would suggest that TTC, a different company in a different industry, would receive less than it billed for the same reason.

Ainabe has failed to produce sufficient evidence to rebut the presumption under the Guidelines that she intended for each company to be paid the full amount billed.[34]  Therefore, the district court did not clearly err when it found that Ainabe expected Gulf, Gifter, and TTC to be paid the full amounts billed.  Nor did the district court err when it used the aggregate amounts billed to calculate the intended loss.

*     *     *

For the foregoing reasons, we AFFIRM the district court's sentence.

---

[32] *Isiwele*, 635 F.3d at 202-03.

[33] *Id.*

[34] *See* U.S.S.G. § 2B1.1 cmt. n.3(F)(viii) ("[T]he aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss . . . if not rebutted.").

No. 18-20689

JAMES L. DENNIS, Circuit Judge, specially concurring:

I join the judgment of the panel but write separately to express my disagreement with circuit precedent upon which the panel relies and is bound.

Along with affirming the other sentencing enhancements applied to Ainabe, we uphold the two-level increase pursuant to § 2B1.1(b)(2)(A)(i), which applies when the offense "involve[s] 10 or more victims." U.S.S.G. § 2B1.1(b)(2)(A)(i). Ainabe's offense satisfies this quantitative requirement based on the number of Medicare beneficiaries whose identities she stole. The determination that Medicare beneficiaries who have their identity stolen constitute "victims" under the Guidelines stems from this court's decision in *United States v. Barson*, 845 F.3d 159, 167 (5th Cir. 2016). In that case, we held that Application Note 4(E) to section 2B1.1 "defines 'victim' in a way that encompasses . . . Medicare beneficiaries because it includes 'any individual whose means of identification was used unlawfully or without authority.'"[1] *Id.* (quoting U.S.S.G. § 2B1.1 cmt. n.4(E)). I believe this reading of "victim" is incorrect.

The dissent in *Barson* noted that, in 2009, the Sentencing Commission expanded the definition of "victim" to include individuals in cases of identity theft whose "means of identification w[ere] used unlawfully or without authority, regardless of whether any pecuniary harm was incurred." Office of General Counsel, *Victim Primer* § 2B1.1(b)(2), U.S. SENTENCING COMM'N (2013), at 8; *see* 845 F.3d at 168-70 (Jones, J., concurring in part and dissenting in part). Reviewing the purpose behind the amendment, the dissent explained:

---

[1] Application Note 4(E) provides in full: Cases Involving Means of Identification.--For purposes of subsection (b)(2), in a case involving means of identification "victim" means (i) any victim as defined in Application Note 1; or (ii) any individual whose means of identification was used unlawfully or without authority. U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. n.4(E).

13

while a victim of identity theft may be reimbursed by a third-party or bank, the [Sentencing] Commission explained that "such an individual [victim], even if fully reimbursed, must often spend significant time resolving credit problems and related issues, and such lost time may not be adequately accounted for in the loss calculations under the guidelines." According to the Commission, this hassle and lost time justified considering as a victim for sentencing purposes anyone whose identity was stolen . . . [In this case, t]he government has not established that the Medicare claimants [whose identities defendants used] had to spend "significant time," or any time at all, resolving credit or related issues. Even real Medicare beneficiaries are not normally victims of Medicare fraud because Medicare, not the patient, pays the billing provider directly. The real victim is the U.S. taxpayer, through Medicare, and that has been accounted for by the guidelines in this case. There is no proof at all that the purported beneficiaries in this case suffered any harm, pecuniary or otherwise.[2]

*Barson*, 845 F.3d at 170.

Similarly here, the record does not show that Medicare beneficiaries spent "significant time"—or any time at all—resolving credit problems or related issues due to Ainabe's use of their identities. Based on the express rationale behind Application Note 4(E), the government ought shoulder the burden of proving this hardship to Medicare beneficiaries before they can properly be deemed "victims" under the Guidelines. *See United States v. Watts*, 519 U.S. 148, 156 (1997) (government must prove conduct by a preponderance of the evidence at the sentencing phase). Further, the loss to the real victim—the American taxpayer—has already been accounted for in Ainabe's three-level sentencing enhancement under section 2B1.1(b)(7)(B)(ii) and the eighteen-level enhancement under section 2B1.1(b)(1)(J).

---

[2] One salient distinction between *Barson* and the case at bar is that in *Barson* some of the Medicare beneficiaries whose identity defendants used as part of their fraudulent scheme "were paid to do so and . . . [c]onsequently . . . could have been considered co-conspirators in the fraud." 845 F.3d at 169 (internal quotation marks omitted). Nevertheless, the reasoning expressed in Judge Jones's partial dissent applies to the facts of this case.

No. 18-20689

Bound by *Barson*'s incorrect interpretation of "victim," I respectfully concur.