# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 27, 2020

Lyle W. Cayce
Clerk

No. 19-20098

United States of America,

*Plaintiff—Appellee*,

*versus*

John P. Ramirez, *Medical Doctor*,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:16-CR-258-1

Before Smith, Clement, and Oldham, *Circuit Judges*.

Andrew S. Oldham, *Circuit Judge*:

Dr. John Ramirez committed healthcare fraud. The district court sentenced him to 300 months in prison. Ramirez argues that his sentence is unlawful because the district court miscalculated his offense level. We disagree and affirm.

I.

Ramirez defrauded Medicare. He falsely certified that Medicare beneficiaries needed a specialized form of nursing care called "home health services." Medicare pays for such services only where a physician certifies

that he evaluated the patient face-to-face and determined that home health services were medically necessary. Ramirez signed hundreds of those certifications. But he did so without *meeting* the patients, much less evaluating them.

Ramirez's fraud caused two different types of financial loss to Medicare. First, Medicare paid for each certification that Ramirez falsely made. At the Amex Medical Clinic, for example, Ramirez falsely certified that he evaluated almost 4,000 patients. Amex requested almost $650,000 in Medicare reimbursements for those evaluations. Medicare paid Amex more than $200,000. Ramirez signed similarly fraudulent certifications at two other clinics, named EverBright and QC.

The second form of financial loss to Medicare was more astonishing. Amex, EverBright, and QC sold Ramirez's fraudulent certifications to hundreds of home health agencies, and those agencies in turn used the certifications to bill Medicare for home health services that were medically unnecessary, never provided, or both. For example, the certifications Ramirez fraudulently signed for Amex cost Medicare $14,577,715.91. Similar certifications at EverBright and QC cost Medicare $11,943,808.93.

A jury found Ramirez guilty. The Pre-Sentence Report ("PSR") recommended a Guidelines offense level of 43. The PSR premised that recommendation on three findings that are relevant to this appeal.

No. 19-20098

First, the PSR calculated that Ramirez's fraud cost Medicare more than $25 million. The PSR explained that calculation in this table[1]:

| Clinic | Intended (billed) loss amount | Actual (paid) loss amount / restitution to Medicare |
|---|---|---|
| Amex | $13,375,742.17  (Part A) | $14,577,715.91 (Part A) |
| | $     649,026.45  (Part B) | $     207,516.55  (Part B) |
| Ever Bright | $    244,000.00    (Part A) | $    272,000.00  (Part A) |
| | $  59,294.00    (Part B) | $    30,756.00  (Part B) |
| QC | $11,062,832.39  (Part A) | $11,641,052.93  (Part A) |
| **TOTAL** | **$25,390,895.01** | **$26,729,041.39** |

That loss amount triggered a 26-point increase to Ramirez's offense level. *See* U.S.S.G. § 2B1.1(b)(1)(L) (imposing a 22-level increase for an offense causing loss of more than $25 million); *id.* § 2B1.1(b)(7)(A), (B)(iii) (imposing a 4-level increase for defrauding a government healthcare program of more than $20 million).

Second, the PSR determined that Ramirez's offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." *Id.* § 2B1.1(b)(11)(C)(i). That triggered another 2-point increase to Ramirez's offense level.

---

[1] The Medicare program consists of multiple "parts." As relevant here, Part A covers home healthcare; Part B covers physician services. The PSR loss-calculation table separates the two different losses to Medicare—the amounts paid for Ramirez's certifications (Part B) and the amounts paid for home healthcare services predicated on Ramirez's certifications (Part A).

No. 19-20098

Third, the PSR determined that Ramirez's offense involved 10 or more victims. That triggered another 2-point increase to his offense level under U.S.S.G. § 2B1.1(b)(2)(A)(i).

The district court accepted the PSR over Ramirez's objections. It therefore assigned Ramirez an offense level of 43 and a criminal history category of I. That generated a recommended Guidelines sentence of life in prison. But because no count of conviction prescribed a statutory maximum sentence of life, the Guidelines automatically adjusted the recommended sentence to 300 months. *See id.* § 5G1.2(b). The district court imposed that recommended sentence. Ramirez timely appealed.

## II.

Ramirez challenges three aspects of his offense-level calculation. Then he complains that the district court denied his request for an evidentiary hearing. We explain and reject each of his arguments.

## A.

Ramirez first contests the factual basis for the loss amount, which added 26 points to his offense level. "In such a challenge, we ask whether the district court relied on 'clearly erroneous facts.'" *United States v. Mazkouri*, 945 F.3d 293, 303 (5th Cir. 2019) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). We find clear error only if the evidence, taken in its entirety, leaves us with a firm conviction the district court erred. *Ibid.*

To determine the loss amount, the sentencing court looks to the greater of "actual loss or intended loss" resulting from the defendant's crime. U.S.S.G. § 2B1.1 cmt. n.3(A). The Guidelines say that "actual loss" means "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3(A)(i). In calculating that harm, the sentencing judge "need only make a reasonable estimate." *Id.* cmt. n.3(C). And because the

sentencing judge is best able to weigh the evidence and estimate loss based upon that evidence, his "loss determination is entitled to appropriate deference." *Ibid.*; *accord Mazkouri*, 945 F.3d at 303.

Loss-amount calculations aren't limited to the offense of conviction. The Guidelines tell us to consider "other offenses in addition to the acts underlying the offense of conviction, as long as those offenses constitute relevant conduct as defined in the Guidelines." *United States v. Barfield*, 941 F.3d 757, 762 (5th Cir. 2019) (quotation omitted), *cert. denied*, 140 S. Ct. 1282 (2020). Relevant conduct includes "acts and omissions" that are "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). To establish that conduct is "relevant," the Government may show another offense is connected to the offense of conviction "by *at least one common factor*, such as common victims, common accomplices, common purpose, or similar modus operandi." *Id.* cmt. n.5(B)(i) (emphasis added).

Here, the sentencing court calculated the "actual loss" resulting from Ramirez's fraudulent activity as $26,729,041.39. It determined that amount by aggregating the total amount Medicare paid on two categories of fraudulent claims: (1) $14,785,232.46 that Medicare paid for home health and physician services based on Ramirez's certifications at Amex; and (2) $11,943,808.93 that Medicare paid for home health and physician services based on Ramirez's certifications at EverBright and QC.[2]

---

[2] In calculating the loss amount, the district court relied on Ramirez's PSR. "Generally, a PSR bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations." *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (per curiam) (quotation omitted). The court also can adopt facts contained in the PSR so long as those facts have an "adequate evidentiary basis" and the "defendant does not present rebuttal evidence or otherwise demonstrate that the information . . . is unreliable." *Ibid.* (quotation omitted).

No. 19-20098

1.

Ramirez first argues that the district court shouldn't have held him accountable for category (1), the $14.8 million in Amex-related losses. That is so, Ramirez contends, because he didn't personally bill the Government for $14.8 million. Ramirez further contends that he didn't know others were using his certifications to bill Medicare.

The record at sentencing showed otherwise. Ramirez spent an hour or two at Amex each week. During that time, he signed huge stacks of certification forms that enabled providers to falsely bill Medicare for home health services. And there is no reasonable basis for doubting whether these stacks of forms were part of a fraudulent scheme. For example, many were blank when Ramirez signed them. One was entitled "**FACE TO FACE ENCOUNTER**." And it contained the following certification:

I CERTIFY THAT THE ABOVE PATIENT WAS SEEN AT THE DATE ENTERED ABOVE AND THAT THE PATIENT MEETS THE ELIGIBILITY REQUIREMENTS FOR HOME HEALTH (HOMEBOUND). I FURTHER CERTIFY THAT THE HOME HEALTH SERVICES ARE JUSTIFIED BASED UPON THE MEDICAL CONDITION OF THE PATIENT.

Physician's Printed Name: John Ramirez, M.D.         Signature/Date

Yet beneficiaries testified they never met Ramirez.

Moreover, Ramirez himself appeared to recognize the (obvious) fact that his false certifications were illegal. He cautioned Amex's owner that if he signed more than 100 certification forms per week, or more than 500 per month, Medicare might catch on and raise a "red flag." Not only could the district court find the Amex-related losses to Medicare "reasonably foreseeable," U.S.S.G. § 2B1.1 cmt. n.3(A)(i), it also could find Ramirez did in fact foresee them.

We find no clear error in holding Ramirez responsible for the Amex-related losses to Medicare.

2.

Second, Ramirez argues his loss-amount calculation shouldn't include approximately $12 million for losses related to his fraudulent certifications at EverBright and QC. In Ramirez's view, the district court should have excluded those sums from the loss amount because "the Government provided no evidence to link Dr. Ramirez" to EverBright, QC, or their fraudulent activities.

There was ample evidence. Ramirez's co-conspirator and former Amex employee, Trondelyn Brown, explained in interviews with federal agents that Ramirez told her to open EverBright, helped her obtain a DBA through LegalZoom, and walked her through the process of applying to become a Medicare services provider. Ramirez admitted to encouraging Brown to open EverBright. In fact, he told her to open the clinic in the same building as Amex so she could service some of Amex's home health agencies.

Ramirez also helped another former Amex employee, Brenda Rodriguez, open QC. Ramirez admitted that he "may have signed [certification forms] for Rodriguez" at QC. And in his objections to the PSR, Ramirez straightforwardly admitted that he worked at both clinics, but "only showed up periodically." Of course, he only showed up periodically at Amex too—and Ramirez's merely periodic appearances are part of the Government's proof that he did not in fact evaluate thousands of patients he certified for Medicare. He also conceded that Amex, EverBright, and QC "all implemented the same scheme of using pre-signed blank forms" to provide home healthcare.

Given all this, the district court did not clearly err in concluding that EverBright and QC shared "common accomplices, common purpose[s], or

similar modus operandi" with Amex. *United States v. Ainabe*, 938 F.3d 685, 690 (5th Cir. 2019) (emphasis and quotation omitted), *cert. denied*, No. 19-1407, 2020 WL 5882339 (2020) (mem). In fact, they may have shared all three. These schemes therefore constitute relevant conduct within the meaning of the Guidelines. *See* U.S.S.G. § 1B1.3(a)(2); *Ainabe*, 938 F.3d at 690.

Taking the Amex and QC/EverBright schemes together, the district court correctly calculated the loss amount. And it therefore correctly increased Ramirez's offense level by 26 points: 22 points for causing a loss in excess of $25 million and 4 points for causing a loss to a government healthcare program in excess of $20 million. *See* U.S.S.G. § 2B1.1(b)(1)(L), (b)(7).

## B.

Next, Ramirez argues the district court erroneously added 2 points to his offense level under U.S.S.G. § 2B1.1(b)(11)(C)(i). That Guideline applies where the offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." Ramirez argues "the use of patients' information . . . did not result in the production of any other means of identification."

Not so. Every Medicare reimbursement claim—fraudulent or otherwise—"bears a unique, Medicare-issued claim number tied to a particular beneficiary." *United States v. Kalu*, 936 F.3d 678, 681 (5th Cir. 2019). So whenever Amex, EverBright, QC, or an affiliated home healthcare provider fraudulently billed Medicare for services purportedly rendered to a beneficiary, it (1) used that beneficiary's information unlawfully, and (2) produced a unique Medicare-issued claim number (another means of identification). Thus, the district court did not err in increasing Ramirez's offense level by 2 points under § 2B1.1(b)(11)(C)(i).

No. 19-20098

## C.

Next, Ramirez argues the district court erroneously added 2 points to his offense level under U.S.S.G. § 2B1.1(b)(2)(A)(i). That Guideline applies where the offense "involved 10 or more victims." Ramirez appears to argue that his offense involved only one victim: Medicare.

Our precedent forecloses that argument. We've said elsewhere the "victims" in Guideline 2B1.1 include "any individual whose means of identification was used unlawfully or without authority." *United States v. Barson*, 845 F.3d 159, 167 (5th Cir. 2016) (per curiam) (quoting U.S.S.G. § 2B1.1 cmt. n.4(E)); *accord Ainabe*, 938 F.3d at 689 (quoting *Barson*, 845 F.3d at 167); *Mazkouri*, 945 F.3d at 304–05. And we've also held that submitting a fraudulent Medicare claim is an unlawful use of a beneficiary's information. *See Kalu*, 936 F.3d at 681. Our precedent therefore dictates that each Medicare beneficiary whose information was used in a fraudulent claim is a "victim" within the meaning of § 2B1.1(b)(2)(A)(i). The district court reasonably concluded that Ramirez bore responsibility for thousands of fraudulent claims and hence had thousands of victims.

## D.

Finally, Ramirez argues the district court erred in denying him a hearing at sentencing. Ramirez sought an evidentiary hearing to submit five categories of "evidence and testimony that [his] trial attorneys . . . failed to submit as evidence at trial."

There's no doubt that a district court "may permit the parties to introduce evidence on [] objections" to a PSR. Fed. R. Crim. P. 32(i)(2); *see also* U.S.S.G. § 6A1.3(a) (providing that parties "shall be given an adequate opportunity to present information to the court" regarding any sentencing factor in dispute). When a court refuses to hold a full hearing on that evidence, we review its decision for an abuse of discretion. *United States*

No. 19-20098

*v. Hass*, 199 F.3d 749, 751 (5th Cir. 1999). But as a general matter, "there is no abuse of discretion when a defendant has an opportunity to review the PSR and submit formal objections to it." *United States v. Tuma*, 738 F.3d 681, 693 (5th Cir. 2013).

Here, the district court did not abuse its discretion in refusing to hold an evidentiary hearing. Ramirez had the opportunity to review the PSR and submit formal objections to it. His counsel used that opportunity. And the probation office properly resubmitted the PSR with Ramirez's objections and the Government's responses. *See* FED. R. CRIM. P. 32(g). The district court acknowledged each objection and adopted the Government's answers to each. The court also offered defense counsel and the Government an opportunity to make additional objections. Neither party did so. The district court was well within its discretion in concluding a more extensive evidentiary hearing was unnecessary.

The district court's judgment is therefore AFFIRMED.