# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 15, 2022

Lyle W. Cayce
Clerk

No. 20-20645

United States of America,

*Plaintiff—Appellee*,

*versus*

Yolanda Hamilton, *Medical Doctor*,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CR-418-1

Before Higginson, Willett, and Ho, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

A jury convicted Dr. Yolanda Hamilton of conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349; conspiracy to solicit and receive healthcare kickbacks, in violation of 18 U.S.C. § 371; and two counts of false statements relating to healthcare matters, in violation of 18 U.S.C. § 1035. On appeal, Dr. Hamilton challenges both her conviction and sentence. For the following reasons, we AFFIRM.

No. 20-20645

## I.

Dr. Hamilton, a licensed physician, owned and operated HMS Health and Wellness Center in Houston, Texas and was the sole physician at her clinic. Around June 2012, Dr. Hamilton enrolled as a Medicare provider. In addition to providing primary care and gastroenterology services, Dr. Hamilton certified Medicare patients for home healthcare.

The relevant background on Medicare processes related to home healthcare was helpfully summarized in *United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018):

> Home health care services are those skilled nursing or therapy services provided to individuals who have difficulty leaving the home without assistance. . . . The process for receiving home health care services begins when a physician identifies a patient as an eligible candidate. . . . Then a nurse goes to the patient's home to assess if she is homebound, completing an Outcome and Assessment Information Set ("OASIS"). The nurse then develops a plan of care based on the OASIS and forwards that document [known as Form 485] to a physician for approval. . . . In 2011, Medicare implemented a face-to-face requirement to further ensure that medical professionals would not order home health care without ever seeing the patient. This required medical professionals to actually see the patient for the initial meeting, but "[t]he face-to-face patient encounter may occur through telehealth in person." [42 C.F.R. 424.22(a)(1)(v)(B).] Regulations allow for medical professionals who are not physicians to complete the face-to-face encounter, but the professionals have to be under the supervision of a physician. A medical professional certifies that they completed this encounter by completing a face-to-face addendum. The agency then sends the addendum with the Form 485 certification forms, which were used to certify patients for home health care to Medicare for reimbursement. If the professional determines

the patient is homebound [and signs the Form 485], the agency staff immediately provides that care.

*Id.* at 764.

A physician signing a Form 485 (and thus certifying a patient for home healthcare) must attest that the patient is confined to the home ("homebound"). 42 C.F.R. § 424.22(a)(1)(ii). An individual is confined to the home if (1) "the individual has a condition, due to an illness or injury, that restricts the ability of the individual to leave his or her home except with the assistance of another individual or the aid of a supportive device (such as crutches, a cane, a wheelchair, or a walker)," *or* "if the individual has a condition such that leaving his or her home is medically contraindicated," *and* (2) "there exists a normal inability to leave home *and* that leaving home requires a considerable and taxing effort by the individual." 18 U.S.C. § 1395n(a) (emphasis added). The initial certification lasts 60 days, after which time the physician must recertify the patient. 42 C.F.R. § 424.22(b).

For some patients that Dr. Hamilton certified, she conducted the required face-to-face encounter herself at her clinic. For others, a nurse practitioner conducted the face-to-face encounter at the patient's home. When the patient was seen by Dr. Hamilton at her clinic, Dr. Hamilton charged a $60 fee. This fee was typically paid by representatives of the home healthcare agencies ("HHAs") to whom she was certifying patients, but at least on some occasions, the fee was paid by the patients themselves. After a period of time, Dr. Hamilton instituted a policy that the Form 485, the certification that the HHAs needed in order to bill Medicare for home healthcare services, *see* 42 C.F.R. § 424.22(a)(1), would not be released to the HHAs until the $60 fee was paid.

Simultaneously, some HHAs in Houston were paying individuals known as "marketers" or "recruiters" to recruit Medicare beneficiaries for

home healthcare. Recruiters then paid the patients they recruited in exchange for their getting certified to receive home healthcare. HHAs often falsified information in the OASIS and Form 485s that they submitted to physicians for certification in order to ensure the physician certified the patients for home healthcare.

In November 2015, the FBI executed a search warrant at HMS, Dr. Hamilton's clinic. A grand jury later charged Dr. Hamilton with one count of conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349; one count of conspiracy to solicit and receive kickbacks, in violation of 18 U.S.C. § 371; and four counts of making false statements relating to healthcare matters, in violation of 18 U.S.C. § 1035. The Government alleged that Dr. Hamilton participated in a conspiracy to commit healthcare fraud with the HHAs by certifying patients for home healthcare when she knew they were not homebound as defined by Medicare. Further, the Government alleged that the $60 payments that Dr. Hamilton demanded before she would release the certifications to the HHAs were illegal kickbacks. The substantive counts of making false statements were tied to Dr. Hamilton's certification of four individual patients for home healthcare.

Dr. Hamilton was first tried in May 2019. After a six-day trial, the jury was unable to reach a unanimous verdict, and the district court declared a mistrial. Prior to the second trial, the Government dismissed one of the false statements counts. In addition, Dr. Hamilton noticed her intent to call an expert witness, but the district court excluded the witness's testimony.

At the second trial, the Government presented testimony from: a Medicare claims analyst; two of Dr. Hamilton's former employees; the three patients associated with the false statements counts; three HHA owners to whom Dr. Hamilton certified patients (and who had already pled guilty to healthcare fraud charges); an HHA recruiter (who had pled guilty to

kickback charges); an HHA owner who met with Dr. Hamilton but did not send patients to her clinic; and a certified fraud examiner who analyzed Medicare claims data and patient files for the Government.  Dr. Hamilton testified in her own defense and presented numerous witnesses, including several former employees, a former patient, and four character witnesses.

The jury returned a verdict of guilty on all counts except one of the false statements counts, for which Dr. Hamilton was acquitted.   At the close of the Government's case and following the verdict, Dr. Hamilton moved for a judgment of acquittal, which the district court denied.  The district court then sentenced Dr. Hamilton to 60 months' imprisonment, a downward variance from the Guidelines range, and $9.5 million in restitution.  Dr. Hamilton filed a timely notice of appeal.

II.

Dr. Hamilton challenges the sufficiency of the evidence for each count of conviction: conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349; conspiracy to solicit and receive healthcare kickbacks, in violation of 18 U.S.C. § 371; and two counts of false statements relating to healthcare matters, in violation of 18 U.S.C. § 1035.

"Where, as here, a defendant has timely moved for a judgment of acquittal, this court reviews challenges to the sufficiency of the evidence *de novo*."   *United States v. Nicholson*, 961 F.3d 328, 338 (5th Cir. 2020). "Appellate review is highly deferential to the jury's verdict, and a verdict is affirmed unless, viewing the evidence and reasonable inferences in [the] light most favorable to the verdict, no rational jury 'could have found the essential elements of the offense to be satisfied beyond a reasonable doubt.'" *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) (quoting *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016)).  However, "a verdict may not rest on mere suspicion, speculation, or conjecture, or an overly attenuated piling

of inference on inference." *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996).

The parties largely agree that Dr. Hamilton engaged in the acts underlying the convictions: Dr. Hamilton owned and operated a clinic where she saw patients and certified those patients for home healthcare. Dr. Hamilton had a policy of not releasing the home healthcare certifications until $60 was paid to the clinic per patient. The HHAs regularly paid that $60. Dr. Hamilton and the Government disagree, however, about whether Dr. Hamilton agreed to, and did willfully participate in, a conspiracy with the HHAs. The Government contends that Dr. Hamilton joined in a conspiracy with the HHAs by (1) demanding a $60 kickback from the HHAs in exchange for certifications, and (2) certifying patients for home healthcare that she knew were not homebound. By contrast, Dr. Hamilton contends that the $60 fee was a co-pay that she was permitted to charge under Medicare regulations, that the HHAs paid the $60 on behalf of the patients, and that all of the certifications for home healthcare were medically necessary based on the information the HHAs and patients presented to Dr. Hamilton.

## A.

Dr. Hamilton challenges her conviction on one count of conspiracy to solicit and receive kickbacks (Count 2). 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b.

The Government was required to prove beyond a reasonable doubt "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Mauskar*, 557 F.3d 219, 229 (5th Cir. 2009) (quoting *United States v. Williams*, 507 F.3d 905, 910 n.4 (5th Cir. 2007)).

The Government must also prove "that the defendant acted willfully, that is, 'with the specific intent to do something the law forbids.'" *United States v. Njoku*, 737 F.3d 55, 64 (5th Cir. 2013) (quoting *United States v. Garcia*, 762 F.2d 1222, 1224 (5th Cir. 1985)). Here, the object of the conspiracy was to "solicit[] or receive[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . . in return for referring" a patient for home healthcare. 42 U.S.C. § 1320a-7b(b)(1)(A).

"The *sine qua non* of a conspiracy is an agreement." *United States v. Barnes*, 979 F.3d 283, 295 (5th Cir. 2020). "The agreement between conspirators may be silent and need not be formal or spoken," *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012), but "an agreement to commit a crime cannot be lightly inferred," *Ganji*, 880 F.3d at 768. An agreement may be proven through "evidence of the conspirators' concerted actions," but "this concert of action must illustrate a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* at 767-68 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 754 (1984)).

The evidence was sufficient to prove that Dr. Hamilton made an agreement to and did receive $60 kickbacks in exchange for home healthcare certifications. First, the Government presented testimony from the HHA owners and Dr. Hamilton's former employees to show an agreement. They testified that Dr. Hamilton required a $60 payment per patient before certifications would be released, that Dr. Hamilton met with HHA owners and discussed the $60 payment with them, and that the HHAs did in fact pay the $60 fee. Second, it was not unreasonable for the jury to conclude that the $60 payments were kickbacks, rather than legitimate co-pays, based on the evidence that patients rarely paid the fee, that Dr. Hamilton charged a uniform $60 fee regardless of the services rendered (despite testimony from the Medicare claims analyst that co-pays should reflect the services

provided), and that certifications were withheld until payment of the $60 fee. *See United States v. Dailey*, 868 F.3d 322, 331 (5th Cir. 2017) (evidence that defendant withheld certifications until payment supported kickback conviction). Finally, the evidence supported a finding that Dr. Hamilton "acted willfully," *Njoku*, 737 F.3d at 64, in other words, that she knew the $60 payments were illegal kickbacks. Dr. Hamilton testified that she knew kickbacks were illegal. In addition, a letter from an HHA owner objecting to the $60 fee on the grounds that it constituted a violation of Medicare rules was found at Dr. Hamilton's office, and one former employee testified that, after Dr. Hamilton was indicted, she told the former employee to say that the $60 payments were for patient co-pays, which the former employee did not believe to be true.[1]

Dr. Hamilton counters with evidence that the $60 payments were not kickbacks but rather co-pays paid by the HHAs on behalf of patients. For example, Dr. Hamilton and her former employees testified that Dr. Hamilton instituted the policy requiring payment prior to releasing certifications only after their attempts to collect co-pays from patients failed because patients often did not have money to pay or were unreachable. One of Dr. Hamilton's former employees testified that because the HHAs wanted the certifications and because Dr. Hamilton would not release them if the $60 hadn't been

---

[1] Dr. Hamilton argues that the evidence was insufficient to find that she acted willfully, analogizing to *United States v. Nora*, 988 F.3d 823 (5th Cir. 2021). In *Nora*, as to willfulness, there was evidence that the defendant had completed trainings on Medicare regulations and compliance—without any evidence of the content of those trainings—and testimony by alleged co-conspirators that everyone in the defendant's workplace knew about the misconduct. *Id.* at 831-32. We said that the "speculative leap" jurors would have to make about the content of the trainings was insufficient for a finding of willfulness, and the "general statements" that "everybody knew" were insufficient to "impute 'bad purpose' to all 150 employees." *Id.* Here, the evidence of willfulness, though circumstantial, was not solely based on general statements or speculative leaps.

paid, the HHAs voluntarily paid the $60. The same former employee also testified that an HHA owner told her that they recouped the $60 co-pay from patients. Former employees also testified that the $60 payments were for "the patient's balance," not just "paperwork." [2]

While there was undoubtedly evidence at trial to support Dr. Hamilton's theory of the case, the jury was entitled to believe the Government's theory instead. *See United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc) ("A jury is free to choose among reasonable constructions of the evidence."); *see also United States v. Vargas-Ocampo*, 747 F.3d 299, 301-302 (5th Cir. 2014) (en banc) (abandoning use of the "equipoise rule"). Dr. Hamilton's argument that "the jury should have believed her theory over the government's theory . . . does not establish insufficiency of the evidence." *United States v. Veasey*, 843 F. App'x 555, 564 (5th Cir. 2021) (per curiam). Because the Government presented evidence from which the jury could reasonably infer that Dr. Hamilton made an agreement to receive kickbacks in exchange for home healthcare certifications, and that she did so willfully, the evidence was sufficient to support the conviction for conspiracy to solicit and receive kickbacks.

## B.

Dr. Hamilton next challenges her conviction on one count of conspiracy to commit healthcare fraud (Count 1). 18 U.S.C. §§ 1347, 1349.

---

[2] Dr. Hamilton also argues that because it was the patients and recruiters, rather than she, who chose the HHAs, the Government failed to show that Dr. Hamilton "referred" patients to the HHAs. *See* 42 U.S.C. § 1320a-7b(b)(1)(A) ("Whoever knowingly and willfully solicits or receives" a kickback "in return for *referring* an individual . . . ." (emphasis added)). However, in *United States v. Dailey*, 868 F.3d 322 (5th Cir. 2017), we rejected that same argument, holding that "[b]y signing the Form 485s in exchange for a kickback, Dailey was authorizing care by a particular provider . . . and was therefore 'referring' patients to that provider." *Id.* at 331.

No. 20-20645

The Government alleged that Dr. Hamilton joined in a conspiracy to commit healthcare fraud both by submitting claims obtained through kickbacks and by certifying patients for home healthcare who Dr. Hamilton knew were not homebound.

At trial, the Government was required to prove beyond a reasonable doubt that "(1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *Grant*, 683 F.3d at 643. A person commits healthcare fraud by "knowingly and willingly execut[ing] . . . a scheme . . . to defraud any healthcare benefit program." 18 U.S.C. § 1347(a)(1).

Dr. Hamilton argues that the Government failed to prove her certifications were fraudulent because there was no expert testimony on the medical necessity of home healthcare for her patients. She reasons that because Medicare requires a physician to make the determination that home healthcare is medically necessary, it is a determination "based on scientific, technical, or other specialized knowledge," and the "arguments of counsel and interpretations of lay witnesses" cannot be the sole basis for a jury's determination of lack of medical necessity. Fed. R. Evid. 701.

We have repeatedly disavowed categorical rules requiring expert testimony for a jury finding of medical necessity. *See United States v. Sanjar*, 876 F.3d 725, 745 (5th Cir. 2017); *United States v. Martinez*, 921 F.3d 452, 474-75 (5th Cir. 2019); *United States v. Mesquias*, 29 F.4th 276, 282 (5th Cir. 2022). In *Sanjar*, we left open the possibility that there could be "technical medical diagnoses on which expert testimony would be needed to prove medical necessity." 876 F.3d at 745. But that is not the case here. Though we have said that whether a person is homebound is "a medico-legal

determination," which "is akin to a term of art," *United States v. Barnes*, 979 F.3d 283, 308 (5th Cir. 2020), the Medicare definition of homebound,[3] with which the jury here was provided,[4] is not overly technical and describes conditions "suffered and understood by millions," *Sanjar*, 876 F.3d at 746. Armed with the Medicare definition of homebound, the jury could evaluate—based on the medical records introduced at trial and on the testimony of patients, employees, and Dr. Hamilton herself—whether Dr. Hamilton's patients were homebound and, if not, whether she knew that patients were not homebound.

Dr. Hamilton points us to *United States v. Martinez*, in which we stated "a simple but significant rule: so long as the jury was not forced to rely on disconnected generalizations to conclude [services] were not medically necessary, and instead had some evidence to support the impropriety of each claim, there will be sufficient evidence for the convictions." 921 F.3d at 475. Dr. Hamilton argues that the jury's conclusion that her certifications were not medically necessary (*i.e.*, that her patients were not homebound) rests on "disconnected generalizations." *Id.* However, *Martinez* discussed expert testimony on medical necessity in the context of substantive healthcare fraud charges, not conspiracy, *id.* at 472-73, so reliance on generalizations there was

---

[3] For Medicare, an individual is confined to the home if (1) "the individual has a condition, due to an illness or injury, that restricts the ability of the individual to leave his or her home except with the assistance of another individual or the aid of a supportive device (such as crutches, a cane, a wheelchair, or a walker)," *or* "if the individual has a condition such that leaving his or her home is medically contraindicated," *and* (2) "there exists a normal inability to leave home *and* . . . leaving home requires a considerable and taxing effort by the individual." 18 U.S.C. § 1395n(a) (emphasis added).

[4] At trial, the Government's Medicare claims analyst testified as to the Medicare definition of homebound. Though Dr. Hamilton disputes the accuracy of that testimony, the Medicare claims analyst's definition matches the Medicare definition. *See* 42 U.S.C. § 1395n(a).

more suspect than in the case of conspiracy, where the Government need not prove that *specific* certifications were medically unnecessary.

Moreover, there was more than "some evidence to support the impropriety" of Dr. Hamilton's certifications. *Id.* at 475. At trial, an HHA owner and an HHA recruiter testified that their patients were not homebound. The HHA recruiter testified that she sent patients to Dr. Hamilton's clinic because it was "easy" to get certifications there, and "it was very obvious" her patients were not homebound. Dr. Hamilton's former employees testified that some or most of the patients that were certified as homebound could walk or get around "unassisted." In addition, several patients testified that they *were* able to leave home on their own, did not use assistive devices, and did not need the care Dr. Hamilton certified they did— but did not lie about their condition to Dr. Hamilton. Finally, an HHA owner testified that every time she paid the $60 fee, Dr. Hamilton provided the certification—from which the jury could infer that certification decisions were based on payment, not medical necessity.

The evidence of fraud here is less direct than in some of our previous cases. For example, Dr. Hamilton and her former employees testified that she actually examined the patients she certified for home healthcare, unlike in many healthcare fraud cases. *See, e.g.*, *Njoku*, 737 F.3d at 63; *Sanjar*, 876 F.3d at 746; *United States v. Ramirez*, 979 F.3d 276, 278 (5th Cir. 2020); *Dailey*, 868 F.3d at 329. In addition, none of the witnesses expressed direct knowledge that Dr. Hamilton had agreed to certify patients fraudulently or that she was aware the patients were not homebound, unlike in many healthcare fraud cases. *See, e.g.*, *United States v. Eghobor*, 812 F.3d 352, 362 (5th Cir. 2015) ("The government's primary witness . . . testified that Eghobor admitted patients into PTM by falsifying OASIS forms and Plans of Care."); *Njoku*, 737 F.3d at 63 ("[A co-conspirator] admitted to falsifying forms submitted to Medicare and said that other people she worked with,

including Njoku, participated."). Dr. Hamilton argues that in light of the lack of direct evidence, and the fact that her actions could be interpreted as entirely lawful, the verdict impermissibly rests on "mere suspicion, speculation, or conjecture, or an overly attenuated piling of inference on inference." *Martinez*, 921 F.3d at 466 (quoting *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996)).

But Dr. Hamilton "cannot obtain an acquittal simply by ignoring inferences that can logically be drawn from the totality of the evidence." *Id.* The Government's evidence that patients were not homebound and that their condition was evident was sufficient for the jury to infer that Dr. Hamilton knew the patients were not homebound when she certified them for home healthcare.[5] *See id.* at 475 (patient testimony that "they did not have the symptoms for which tests were conducted" supported jury finding of fraud); *United States v. Robinett*, 832 F. App'x 261, 268 (5th Cir. 2020) (per curiam) (evidence that patients "walked two miles each day" and "cooked [their] own meals" supported finding that defendant knew patients were not homebound). Though Dr. Hamilton testified that her decisions were based on her medical judgment and the information presented to her by the HHAs and the patients, the jury was entitled to discredit her testimony.[6]

---

[5] In addition, the jury's conclusion that Dr. Hamilton's certifications were fraudulent was supported by the evidence that she was being paid to sign them. *Cf. Martinez*, 921 F.3d at 471 ("Evidence of the kickback scheme is relevant to the conspiracy to commit health care fraud because paying patients is clearly a possible indicator of health care fraud.").

[6] Dr. Hamilton analogizes to *United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018), in which we held the evidence insufficient to support a physician's conviction for conspiracy to commit healthcare fraud. *Id.* at 772. In *Ganji*, the defendant "provided testimony of her innocence," giving legitimate explanations for the Government's circumstantial evidence of fraud. *Id.* at 771. But in that case, none of the witnesses "could provide direct evidence of their alleged co-conspirator's actions because the witnesses never acted with the defendants," and thus there was insufficient evidence to prove an

*See Grant*, 683 F.3d at 642 ("The jury 'retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses.'" (quoting *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001))). For the evidence to be sufficient, it "need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Eghobor*, 812 F.3d 352, 362 (5th Cir. 2015) (quoting *Grant*, 683 F.3d at 642). "[V]iewing the evidence and reasonable inferences in [the] light most favorable to the verdict," *Ganji*, 880 F.3d at 767, as we must, and accepting the jury's credibility determinations, there was sufficient evidence to support Dr. Hamilton's conviction for conspiracy to commit healthcare fraud.

## C.

Dr. Hamilton challenges her convictions on two counts of making false statements relating to healthcare matters, 18 U.S.C. § 1035, based on her certifications of patients Kesha Martin and Bernard Miller for home healthcare (Counts 3 and 4).

To support a conviction for making false statements related to healthcare matters, the Government must prove beyond a reasonable doubt that "(1) the defendant made a materially false, fictitious, or fraudulent statement or misrepresentation; (2) in connection with the delivery of [or payment for] health care benefits; and (3) [s]he did so knowingly and willfully." *Dailey*, 868 F.3d at 330.

---

agreement. *Id.* at 766. Absent any other "evidence of the *conspirators' individual actions*," the defendant's unrebutted testimony was sufficient to undermine the conviction. *Id.* at 768. Here, like in *Ganji*, Dr. Hamilton gave innocent explanations for much of the Government's circumstantial evidence. But unlike in *Ganji*, Dr. Hamilton's co-conspirators, patients, and employees testified as to Dr. Hamilton's "*individual actions*" such that there was evidentiary support for the finding of an agreement.

No. 20-20645

Martin's and Miller's testimony at trial was sufficient to prove that neither patient was homebound.  Martin testified that at the time she was being certified for home healthcare by Dr. Hamilton, she would sometimes ride the bus by herself to Dr. Hamilton's clinic; she did not have "any trouble getting up the stairs"; she grocery shopped for herself and carried her own groceries; and she was "able to leave the house just fine."  Similarly, Miller testified that he would "on some occasions" travel by bus to Dr. Hamilton's clinic and that he could leave his home, walk around his apartment complex by himself, and go grocery shopping and carry his own groceries.  Miller also testified that he used the treadmill or elliptical machine at Dr. Hamilton's office.[7]  Both Martin and Miller denied having some of the medical issues described in their Form 485s.[8]

Further, based on Martin's and Miller's testimony, the jury could infer that Dr. Hamilton knew that neither patient was homebound when she certified them for home healthcare.  Martin testified that she did not "pretend that [she was] sick" when she saw Dr. Hamilton, and Miller testified that he did not tell Dr. Hamilton that he could not leave his home. Both Martin and Miller testified that Dr. Hamilton did not ask if they were able to leave their homes.

Although Dr. Hamilton testified that she believed home healthcare to be medically necessary based on her examinations of Martin and Miller and

---

[7] Dr. Hamilton responded that Miller used a recumbent bike in her office, not an elliptical, and that he did so with assistance for therapeutic purposes.

[8] Dr. Hamilton argues that any false statements in the Form 485s were made by the HHAs, not by her.  But Dr. Hamilton's signatures on the Form 485 certifying that patients were homebound, were themselves false statements if Dr. Hamilton knew the patients were not homebound.

15

their diagnoses,[9] the jury was entitled to discount that testimony. *See Grant*, 683 F.3d at 642 ("The jury 'retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses.'" (quoting *Loe*, 262 F.3d at 431)). And the patients' testimony alone adequately supported the opposite conclusion. Thus, the evidence was sufficient to convict Dr. Hamilton of making false statements related to the certifications of Martin and Miller.

### III.

Dr. Hamilton argues that she is entitled to a new trial because the Government—contrary to an alleged pre-trial agreement—failed to notify defense counsel that Dr. Hamilton's former employees were considered co-conspirators,[10] and, as a result, the district court did not give a cautionary instruction regarding the testimony of Dr. Hamilton's former employees.

This argument fails for several reasons. First, Dr. Hamilton has not shown that the Government was obligated to provide notice in advance of trial if it considered the testifying employees co-conspirators. Prior to the first trial, Dr. Hamilton filed a motion requesting that the Government give

---

[9] For example, as to Martin, Dr. Hamilton testified, "[W]hen I saw [Martin] in the office, she was balled up a lot of times on the examination table, having difficulty, you know from pain. And when she walked, she was limping and bent over, you know walking with support." As to Miller, Dr. Hamilton testified, "Mr. Miller had some significant MRIs done that showed herniation, disk herniations, impingement of his nerve. I remember times when he could barely even walk at all."

[10] At sentencing, the presentence investigation report ("PSR") contained a list of unindicted co-conspirators, including the two former employees who testified for the Government, and the Government filed a clarification to add several other former employees to that list. The Government's Sentencing Memorandum reiterated that Dr. Hamilton's employees were participants in the scheme as part of its argument in favor of the Sentencing Guidelines leadership role enhancement. These representations led Dr. Hamilton to believe that the Government considered the former employees co-conspirators.

notice of any statements it intended to introduce under Federal Rule of Evidence 801(d)(2)(E), which exempts statements of a co-conspirator from the definition of hearsay, and the Government agreed to do so. Dr. Hamilton's request, and the Government's agreement, pertained specifically to out-of-court statements made by alleged co-conspirators. Dr. Hamilton did not request, and the Government did not agree to provide, general notice of all individuals the Government deemed co-conspirators.

Second, any failure by the Government to explicitly notify defense counsel that it considered the employees co-conspirators was harmless because the district court gave a cautionary instruction about the testimony of accomplices or co-conspirators. The district court's instruction was nearly identical to this circuit's pattern jury instruction on accomplice testimony. *See* Fifth Circuit Pattern Jury Instructions (Criminal) § 1.16 (2019). The instruction includes as an accomplice "one who has entered into a plea agreement with the government" but does not limit accomplices to those who have pled guilty. Based on the former employees' testimony on their involvement in the conspiracy, and at least one former employee's testimony that she met with the Government several times, the jury could have inferred that the former employees were alleged accomplices and that the cautionary instruction applied to them.

Finally, regardless of whether the Government labels a witness as a co-conspirator, the accomplice instruction is only relevant if the witness "ha[s] anything to gain by testifying" against the defendant. *United States v. Hinds*, 662 F.2d 362, 370-71 (5th Cir. Unit B 1981) (holding that there was "no plain error in failing to give" the accomplice instruction where accomplices "had [no]thing to gain by testifying" because they "had been sentenced and were serving prison terms"); *see also Cool v. United States*, 409 U.S. 100, 103 (1972) (per curiam) ("[Accomplice instructions] represent no more than a commonsense recognition that an accomplice may have a special

interest in testifying, thus casting doubt upon his veracity."). Here, the former employees had no special interest in testifying against Dr. Hamilton because they were not targeted for prosecution.[11] To the extent any of the former employees might have *believed* they would be prosecuted, Dr. Hamilton had notice of that possibility from Government disclosures regarding which employees had been interviewed by the Government, how many times they had been interviewed, and the content of those interviews. Thus, Dr. Hamilton had ample opportunity to request an accomplice instruction specifically regarding the former employees' testimony, regardless of any failure by the Government to notify defense counsel that it considered the employees co-conspirators.[12]

## IV.

Dr. Hamilton also challenges her sentence. After overruling all of Dr. Hamilton's objections to the PSR, the district court imposed a sentence of $9.5 million in restitution and 60 months' imprisonment, a downward variance from the statutory maximum of 300 months, which was below the Guidelines range of 324 to 405 months.

Dr. Hamilton first argues that the district court erred by overruling her objection to the application of the Sentencing Guidelines' four-level

---

[11] At the sentencing hearing, the Government clarified that it did not consider Dr. Hamilton's employees to be "knowing and willful members of the conspiracy" who "have criminal liability" but rather that they were included as participants in the PSR for the purpose of proving that the conspiracy was "otherwise extensive," as required for the Sentencing Guidelines' aggravating role enhancement. *See* U.S.S.G. § 3B1.1 (2018).

[12] In her brief, Dr. Hamilton also raises a claim for a new trial based on the district court's exclusion of her expert witness. However, Dr. Hamilton "cited no authority in support of her contentions," and failed to explain the error in the district court's ruling. *United States v. Demmitt*, 706 F.3d 665, 670 (5th Cir. 2013). Thus, the argument is waived. *Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004).

enhancement for being a leader or organizer. U.S.S.G. § 3B1.1(a). "A defendant's role in the offense is a factual finding reviewed for clear error." *United States v. Warren*, 986 F.3d 557, 567 (5th Cir. 2021). "A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole." *United States v. Akins*, 746 F.3d 590, 609 (5th Cir. 2014) (quoting *United States v. Rose*, 449 F.3d 627, 633 (5th Cir. 2006)).

The Sentencing Guidelines impose a four-level increase in the base offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The commentary to the Guidelines notes that "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." *Id.* cmt. 2; *see also United States v. Ronning*, 47 F.3d 710, 712 (5th Cir. 1995). The commentary defines a participant as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.* cmt. 1.

The district court did not err in overruling Dr. Hamilton's objection to the leader-organizer enhancement. There is little doubt that the conspiracy here involved five or more criminally responsible participants or was otherwise extensive. Four co-conspirators, who had already pled guilty, testified at trial. And many more recruiters and HHA owners were involved in the conspiracy, as were Dr. Hamilton's employees (even if unknowingly). All those actors can be considered in determining that the activity was "otherwise extensive," even if not all were criminally responsible. U.S.S.G. § 3B1.1 cmt. 3. Application of the enhancement here does require that Dr. Hamilton acted as the leader or organizer of at least one other criminally

responsible participant. *Id.* at cmts. 1, 2.[13]  The HHA owners' testimony that Dr. Hamilton discussed the $60 fee in meetings that she arranged and testimony that Dr. Hamilton was responsible for both setting the fee amount and instituting the policy that $60 be paid before releasing certifications support a finding that Dr. Hamilton acted as an organizer of the HHA agency owners in establishing an agreement to pay and receive kickbacks.  Thus, she qualified for the leader-organizer enhancement.

## V.

Dr. Hamilton next challenges the PSR's calculation of the loss amount and its effect on her Sentencing Guidelines range.[14]

The Sentencing Guidelines provide that "the amount of loss resulting from a crime involving fraud is a specific offense characteristic that increases a defendant's base offense level." *United States v. Mahmood*, 820 F.3d 177, 192 (5th Cir. 2016); U.S.S.G. § 2B1.1(b)(1) (2018).  The Guidelines commentary defines the loss amount as "the greater of actual loss or intended loss." § 2B1.1 cmt. 3(A).

"A district court's loss calculation, and its embedded determination that the loss amount was reasonably foreseeable to the defendant, are factual findings reviewed for clear error." *United States v. Brown*, 727 F.3d 329, 341 (5th Cir. 2013).  Even if the district court committed a procedural error in

---

[13] For that reason, the enhancement could not have applied based on Dr. Hamilton's role as an organizer or leader of her employees because, as the Government acknowledged, there is no evidence that Dr. Hamilton's employees were criminally responsible.

[14] Dr. Hamilton's briefs make several passing references to restitution, but she does not argue or explain how the alleged errors in the loss amount calculation affected the district court's partial restitution award.  Nor does she cite any authority specifically related to restitution other than the applicable standard of review.  As such, any argument as to restitution is inadequately briefed and therefore waived. *Demmitt*, 706 F.3d at 670.

calculating the Guidelines range, "[n]ot every procedural error requires reversal." *United States v. Sanchez*, 850 F.3d 767, 769 (5th Cir. 2017). To show that a sentencing error is harmless, "the proponent 'must point to evidence in the record that will convince us that the district court had a particular sentence in mind and would have imposed it, notwithstanding the error.'" *United States v. Ibarra-Luna*, 628 F.3d 712, 718 (5th Cir. 2010) (quoting *United States v. Huskey,* 137 F.3d 283, 289 (5th Cir.1998)).

Here, the PSR calculated the loss amount based on Medicare Part B claims that Dr. Hamilton billed for the actual certifications and recertifications, as well as for services she provided to home healthcare patients in her clinic other than the actual certification. The loss amount also included claims that HHAs billed to Medicare Part A for home healthcare services they provided where Dr. Hamilton was the certifying physician. At trial, a certified fraud examiner, whom the Government contracted to review the Medicare claims and patient files in this case, testified about the data underlying the PSR's calculation. For the Medicare Part B claims, the intended loss amount—*i.e.*, the amount Dr. Hamilton billed to Medicare— was $5,523,680.51, and the actual loss amount—*i.e.*, the amount Medicare actually paid to Dr. Hamilton—was $1,002,622. Of those Medicare Part B claims, only $2,817,545 of the intended loss amount and $274,540.17 of the actual loss amount was for the certifications or recertifications. For the Medicare Part A claims, the intended loss amount—*i.e.*, the amount HHAs billed to Medicare—was $14,295,886.74 and the actual loss amount—*i.e.*, the amount Medicare actually paid to the HHAs—was $16,388,521.86.

Including all of those Medicare claims, the PSR calculated an intended loss amount of $19,819,547.25 and an actual loss amount of $17,391,143.86. Based on a loss amount greater than $9.5 million but less than $25 million, the PSR increased Dr. Hamilton's offense level by 20

levels.[15] U.S.S.G. § 2B1.1(b)(1). The Government endorsed the PSR's loss calculation at sentencing. The district court overruled Dr. Hamilton's objections to the loss amount, which affected the Guidelines range, *see id.*, but the court reduced the restitution amount to $9.5 million.

Dr. Hamilton contends that two types of Medicare claims should have been excluded from the loss amount: (1) claims for services Dr. Hamilton provided to home healthcare patients in her clinic, other than the actual certification ("non-certification Medicare Part B claims") and (2) claims the HHAs billed to Medicare for home healthcare services provided to patients where Dr. Hamilton was the certifying physician ("Medicare Part A claims"). Dr. Hamilton also argues that the loss amount included claims that were not fraudulent.

## A.

The district court did not err by overruling Dr. Hamilton's objection to the inclusion of Medicare Part A claims in the loss amount. In *United States v. Ramirez*, 979 F.3d 276 (5th Cir. 2020), a physician was convicted of fraudulently signing home healthcare certifications. *Id.* at 278. This court affirmed the inclusion of claims that "Medicare paid for home health and physician services based on [the defendant's] certifications" in the loss calculation. *Id.* at 280. These are precisely the type of claims that Dr. Hamilton argues should not be included in her loss amount. Dr. Hamilton attempts to distinguish *Ramirez* based on her more remote connection to the HHAs than the defendant in that case. However, it was not the physician's proximity to the HHA but rather the fact that his fraud "enabled providers

---

[15] Dr. Hamilton also received a 3-level increase under U.S.S.G. § 2B1.1(b)(7)(A) for conviction of an offense "involving a Government health care program" and a loss amount more than $7 million.

No. 20-20645

to falsely bill Medicare for home health services" that led us to affirm the inclusion of these claims in the loss amount calculation. *Id.* at 281. Here, as in *Ramirez*, the defendant's fraudulent certifications enabled the HHAs to bill Medicare for home healthcare services provided to patients who were not actually homebound.[16] And, as in *Ramirez*, it was "reasonably foreseeable" to Dr. Hamilton that the HHAs would bill these claims to Medicare based on her fraudulent certifications. *Id.* at 281. In light of *Ramirez*, it was not error to include the Medicare Part A claims in the loss amount.

### B.

However, the district court did err by overruling Dr. Hamilton's objection to the inclusion of the non-certification Medicare Part B claims in the loss amount because absent the fraud Medicare would have paid for these claims.

"[L]oss in a health care fraud case cannot include any amount the government would have paid in the absence of the crime." *See Sanjar*, 876 F.3d at 748 (citing *Sharma*, 703 F.3d at 324). The Sentencing Guidelines require that the loss amount be offset based on "the fair market value of the . . . services rendered[] by the defendant . . . before the offense was detected." U.S.S.G. § 2B1.1 cmt. 3(E)(i). In *United States v. Mahmood*, 820 F.3d 177 (5th Cir. 2016), we explained that "Medicare receives 'value' within the meaning of U.S.S.G. § 2B1.1 [cmt. 3(E)(i)] when its beneficiaries receive legitimate health care services for which Medicare would pay but for a fraud." *Id.* at 193. "[T]o be entitled to an offset against an actual loss amount . . . , [the defendant] must establish (1) 'that the services [he provided to

---

[16] Medicare regulations require physician certification that a beneficiary is homebound before HHAs can bill Medicare for home healthcare services. 42 C.F.R. § 424.22(a)(1).

No. 20-20645

Medicare beneficiaries] were legitimate' and (2) 'that Medicare would have paid for those services but for his fraud.'" *United States v. Mathew*, 916 F.3d 510, 521 (5th Cir. 2019) (quoting *Mahmood*, 820 F.3d at 194).[17]

The Government contends that Medicare would not have paid the non-certification Medicare Part B claims but for the fraud because "Hamilton would not have seen the patients and would have been unable to submit *any* of the Part B claims" if the HHAs were not sending patients there as a result of the kickback and fraudulent certification scheme. However, the Government misunderstands the nature of the inquiry into whether Medicare would have paid the claims absent the fraud. The question is not whether Dr. Hamilton would have had the opportunity to provide other services absent the fraud, but rather whether those other services were legitimate (*i.e.*, medically necessary and otherwise in compliance with Medicare regulations). *See Mahmood*, 820 F.3d at 194.

For example, in *United States v. Ricard*, 922 F.3d 639 (5th Cir. 2019), an HHA marketer was found guilty in a kickback conspiracy "for referring Medicare patients to a particular health care provider," and the district court included in the loss amount all of Medicare's payments to the defendant's HHA employer because the services provided were obtained through payment of kickbacks. *Id.* at 643, 646-47. We held that the loss amount calculation was error because there was no evidence that the services the HHA provided were not legitimate, did not meet Medicare's basic standards of care, or that Medicare would not have paid for the services absent the kickback scheme. *Id.* at 659. The fact that the HHA would not have seen the patients but for the defendant's fraud did not justify the inclusion of those

---

[17] *Mathew* applied this test in the context of restitution, but *Mahmood* calculated the loss amount for Sentencing Guidelines purposes and restitution purposes in the same manner. *See Mahmood*, 820 F.3d at 192-96.

claims in the loss amount when the services provided were otherwise legitimate.

Here, there is no evidence—and the Government has not argued—that the non-certification Medicare Part B claims were medically unnecessary or otherwise out of compliance with Medicare regulations. Thus, "Medicare would have paid for those services but for [the] fraud," *Mahmood*, 820 F.3d at 194, and they should have been excluded from the loss amount.

Nonetheless, this error was harmless. The intended loss amount for the non-certification Medicare Part B claims was $2,706,135.51, and the actual loss amount for the same claims was $728,081.83. Even deducting the non-certification Medicare Part B claims, the total loss amount remains well above $9.5 million—the bottom end of the range for the Guidelines' 20-level enhancement. *See* U.S.S.G. § 2B1.1(b). As such, the district court's error in overruling Dr. Hamilton's objection to the inclusion of the non-certification Medicare Part B claims in the loss amount did not affect the Sentencing Guidelines range.

## C.

Dr. Hamilton makes several other brief arguments about the loss amount. First, she claims that the Medicare Part A loss amount included HHA claims for home healthcare services where Dr. Hamilton's signature on the Form 485 was forged. However, the Government's fraud examiner testified that his calculations included only claims where a signed Form 485 was found at Dr. Hamilton's clinic, and Dr. Hamilton fails to explain why forged forms would have been found in her own office. Second, Dr. Hamilton claims that the loss amount improperly included claims where an HHA recruiter paid the $60 fee, but the fact that the recruiter, rather than the HHA owner, paid the fee has no bearing on whether that fee was a kickback

No. 20-20645

or whether the certification was fraudulent. Third, Dr. Hamilton challenges the inclusion of claims for patients who paid the $60 fee themselves. Dr. Hamilton points to only one patient for whom there was evidence that the patient, rather than the HHA, paid the $60 fee, and that patient testified that her HHA would pay the fee "most of the time." Even if the district court erred by including claims related to that patient in the loss amount, their exclusion would not have reduced the loss amount to less than $9.5 million and thus would not have affected the Guidelines range. For the same reason, inclusion of claims related to the patient for whom Dr. Hamilton was acquitted of false statements was also harmless.[18]

VI.

For the foregoing reasons, Dr. Hamilton's conviction and sentence are AFFIRMED.

---

[18] Dr. Hamilton also argues that of the 7,461 claims included in the Medicare Part A loss amount, at least 4,100 were associated with patients for whom Dr. Hamilton did not charge a $60 fee because the face-to-face encounter necessary for the certification was conducted by a nurse practitioner ("NP") in the patients' homes, rather than by Dr. Hamilton at her clinic. There are numerous factual uncertainties related to this claim that cannot be resolved by looking to the trial record. Regardless, as to the calculation of the Guidelines range, any error was harmless. Dr. Hamilton's 60-month sentence would have been well below the Guidelines range even if the loss amount had excluded *all* of the Medicare Part A claims. U.S.S.G. § 2B1.1(b)(1); U.S.S.G. ch. 5, pt. A. Moreover, the district court judge's statement at sentencing that he was "contemplating a variance that will take care of all of these objections" indicates that he had "a particular sentence in mind and would have imposed it, notwithstanding [any] error." *Ibarra-Luna*, 628 F.3d at 718.