# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 11, 2026

Lyle W. Cayce
Clerk

————————

No. 25-10234

————————

United States of America,

*Plaintiff—Appellee*,

*versus*

David M. Young, *Medical Doctor*,

*Defendant—Appellant*.

———————————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:21-CR-417-1

———————————————————————————

Before Davis, Jones, and Stewart, *Circuit Judges*.

Edith Hollan Jones, *Circuit Judge*:[*]

Dr. David Young was convicted of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 and three counts of making false statements relating to health care matters, 18 U.S.C. § 1035(a). Sentenced to ten years imprisonment, Dr. Young raises numerous challenges to his conviction and to the loss amount used to calculate his sentencing guidelines

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

range. We find no reversible error. The conviction and sentence are AFFIRMED.

## I.

An eight-day trial featured about twenty witnesses, including the defendant, and numerous exhibits. The evidence revealed extensive Medicare fraud, in that medically unnecessary equipment and genetic tests were being ordered for thousands of patients, for which the perpetrators received tens of millions of dollars in federal reimbursements.

Dr. David Young lived and worked in Fredericksburg, Texas as an experienced emergency room physician at Hill Country Memorial Hospital. In 2017, to supplement his income, Dr. Young started working for purported telehealth companies Expansion Media ("Expansion") and Sunrise Medical ("Sunrise"). These companies used Dr. Young's signed prescriptions for durable medical equipment ("DME") to bill Medicare for items like orthotic braces and prosthetics. Dr. Young testified that when he first started working for Sunrise, he would call patients and perform telehealth exams that lasted between 15 and 45 minutes. Eventually, the volume of patients increased. Sunrise told Dr. Young that he would no longer have to call and examine patients because they would be examined by Sunrise's own medical personnel. Sunrise asked him to limit his role to reviewing their medical charts and merely signing prescriptions based on information it claimed was placed in the charts by medical personnel. In reality, no medical personnel at Sunrise ever examined the patients.

Dr. Young performed similar services for Expansion, another purported telehealth company that specialized in DME prescriptions. Dr. Young received an email from CEO Steven Richardson explaining to him that "[a]ll patients will be fully triaged and recorded before you ever get the request." In fact, no patients were evaluated by a medical professional. In

his testimony at Dr. Young's trial, Richardson admitted that he lied to Dr. Young and intended to give Dr. Young the impression that each patient had been properly evaluated by a medical professional. Further, Richardson admitted that he lied to all of the doctors he worked with because he had to "lead [them] to believe certain things" or else he "couldn't get them to work with [him]."

In 2018, Dr. Young started working for Momentum and signed prescriptions for expensive genetic tests to determine if a person had mutations related to particular types of cancer. Clifford Powell, the owner of Momentum, testified that he hired Dr. Young to review patient information, call patients that he believed would qualify for the genetic tests, determine their eligibility, and then fill out the prescription forms. Powell became concerned with Dr. Young's medical reviews when he noticed that the doctor would sign two or three prescriptions per minute, making it impossible for Dr. Young to have actually called each patient. Powell informed him in a phone call that Momentum was not comfortable with the speed at which he was signing prescriptions for genetic testing because "it looked shady." Dr. Young responded that he was in fact talking to patients and that "his process was to review the charts, call the patients, . . . take notes of everything, and at a later time . . . do all of his signing." Powell did not believe Dr. Young.

Dr. Young argues that Powell never requested that he call patients. His initial offer letter stated that "[a]ll of the intake is already complete" and that Dr. Young need only select "the ICD-10 code, select the test and use [his] electronic signature." Dr. Young also testified that Powell agreed that Dr. Young would not have to call patients as part of his work at Momentum.

Dr. Young was intrigued by the business potential of signing prescriptions for genetic testing, and he encouraged Sunrise to expand into the business. Dr. Young even sent an email to Sunrise with an attachment

listing the commonly used ICD-10 codes used to justify genetic testing. Dr. Young also sent Sunrise an email with an example of an order for cancer genetic testing. Dr. Young sent these emails after Sunrise's office was raided by law enforcement and Sunrise realized that Medicare was cracking down on DME fraud. Sunrise employee Pamela Edwin testified that Sunrise CEO Steve Kahn and Dr. Young were thinking about shifting Sunrise to cancer testing using the same methodology that it had used for DME braces; Sunrise would pre-fill the prescriptions, and Dr. Young would sign them.

Dr. Young testified that he reviewed every chart before entering a prescription and disapproved prescriptions when he thought they were medically unnecessary. Dr. Young testified that no financial incentives motivated his decision on whether to issue a prescription because he was paid between $15–$30 for each chart he reviewed, and his pay did not vary based on whether he issued a prescription.

Over a two-year period, Dr. Young was paid more than $260,000 by Sunrise, $142,000 by Expansion, and $78,000 by Momentum. Dr. Young caused Medicare to be billed for 44,476 DME items, resulting in $34.5 million being billed to Medicare. In 2018, Dr. Young was the fifth-highest prescriber of orthotic braces for Medicare patients nationwide. Dr. Young also caused Medicare to be billed $37.2 million for 3,954 genetic tests. By 2019, he became the seventh-highest prescriber of the relevant genetic tests for Medicare patients nationwide.

In September 2021, Dr. Young was indicted on one count of conspiracy to commit health care fraud and three counts of false statements. Count I charged Dr. Young with conspiring with Steven Kahn, Matthew Harrington, Miranda Harrington, Michael Speer, and other persons to defraud Medicare in violation of 18 U.S.C. § 1349. Counts II through IV charged Dr. Young with making false statements relating to health care

matters, in violation of 18 U.S.C. § 1035(a), regarding medical records and prescriptions for three patients.

In June 2023, a grand jury returned a superseding indictment. The superseding indictment added Clifford Powell and Christian Arendt as co-conspirators under Count I. Count II was amended to reference a different false statement regarding a different patient on a different date. Counts III and IV remained the same.

Once the government closed its case, Dr. Young moved for acquittal under Federal Rule of Criminal Procedure 29. The district court orally denied his motion. In May 2024, the jury found Dr. Young guilty on all counts. After trial concluded, Dr. Young filed motions for acquittal and for a new trial. The district court denied both motions. The district court ruled that the government presented sufficient evidence to convict Dr. Young of health care fraud because Dr. Young allowed Sunrise to use his credentials to pre-fill prescriptions, Dr. Young signed the prescriptions rapidly, Dr. Young continued to sign prescriptions after learning that a patient complained about fraud, and the specific medical assessments listed in the charts cannot be ascertained without physical examinations. The district court also ruled that the government presented sufficient evidence to show that Dr. Young made false statements when he said he completed exams of the patients listed in Counts II–IV, but the patients denied that he examined them.

The district court ruled that venue was proper for Count I because DME was delivered to the Northern District of Texas in furtherance of the conspiracy. The district court also approved venue for Counts II–IV because the false statements were sent to the Northern District of Texas. The government, however, concedes that this aspect of the district court's holding is incorrect because the false statements were not sent to the Northern District.

No. 25-10234

The district court saw no error in its failure to give a jury instruction for multiple conspiracies because the evidence at trial showed that there was a single conspiracy with a common goal. Finally, the district court rejected the claim that it improperly admitted two doctors' testimonies about their experiences working with Sunrise and the red flags that they saw. Because they did not testify about Dr. Young's state of mind, the district court ruled that their testimony was permissible.

Dr. Young was sentenced to 120 months in prison and ordered to pay $26,622,522.82 in restitution, the amount paid by Medicare for Dr. Young's fraudulent claims.

Dr. Young timely appealed.

## II.

Dr. Young's issues on appeal parallel the issues he presented to the district court, and we discuss them in the same order.

### A. Sufficiency of the Evidence

"When a defendant moves for acquittal in the district court, challenging the sufficiency of the evidence, this Court reviews the district court's denial de novo." *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018). "Appellate review is highly deferential to the jury's verdict, and a verdict is affirmed unless, viewing the evidence and reasonable inferences in light most favorable to the verdict, no rational jury 'could have found the essential elements of the offense to be satisfied beyond a reasonable doubt.'" *Id.* (quoting *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016)).

### 1. Conspiracy to Commit Health Care Fraud

Dr. Young challenges the sufficiency of the evidence for engaging in a conspiracy to defraud Medicare. A conviction under 18 U.S.C. § 1349 requires the government to "prove beyond a reasonable doubt that: '(1) two

6

or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement . . . with the intent to further the unlawful purpose.'" *Id.* (quoting *United States v. Eghobor*, 812 F.3d 352, 362 (5th Cir. 2015)). "A person commits healthcare fraud by 'knowingly and willingly execut[ing] . . . a scheme . . . to defraud any healthcare benefit program.'" *United States v. Hamilton*, 37 F.4th 246, 258 (5th Cir. 2022) (quoting 18 U.S.C. § 1347(a)(1)).

"Conspiracy is the agreement to join a common scheme to commit an unlawful goal." *Ganji*, 880 F.3d at 768. "[T]he crime of conspiracy condemns the agreement itself." *Id.* (quoting *United States v. Alvarez*, 610 F.2d 1250, 1253 (5th Cir. 1980)). "Without an agreement, there is no conspiracy." *Id.* Therefore, the existence of "an agreement is a necessary element of conspiracy, and as such, 'the Government must prove [its existence] beyond a reasonable doubt.'" *Id.* at 767 (quoting *United States v. Arredondo-Morales*, 624 F.2d 681, 683 (5th Cir. 1980)). Because it is an essential element of the crime, "[p]roof of an agreement to enter a conspiracy is not to be lightly inferred." *Id.* (quoting *United States v. Johnson*, 439 F.2d 885, 888 (5th Cir. 1971)). For an agreement to be a criminal conspiracy, each party to the agreement "must have had a common intent to commit an unlawful act." *Id.* at 768 (quoting *Alvarez*, 610 F.2d at 1255). "It is not enough that the government proves that the defendant knew something criminal was afoot." *Id.* at 776. Further, the government's demonstration that a person in the defendant's position "should have known" that a conspiracy was afoot is insufficient to support a conviction. *Id.*

The parties agree that Sunrise, Expansion, and Momentum were all engaged in health care fraud. The only question is whether Dr. Young agreed to conspire with them to do so. An agreement "may be silent and informal." *United States v. Barson*, 845 F.3d 159, 163 (5th Cir. 2016). Additionally,

No. 25-10234

"voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *Id.* at 163–64 (quoting *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009)). The government advanced voluminous evidence that allowed the jury to find that Dr. Young entered into such an agreement and had knowledge of its unlawful purpose.

Dr. Young argues that the government's case is infirm because it did not prove that he knew the information in the patients' charts was false. Dr. Young, who testified, admits he was naïve to believe that patients were already evaluated by other medical staff. Dr. Young argues that because he did not know that the patients were not actually being examined, he did not have actual knowledge of the conspiracy.[1] "This argument misconstrues the theory of fraud underlying these charges." *United States v. Little*, No. 21-11225, 2023 WL 7294199, at *3 (5th Cir. Nov. 3, 2023). As was the case in *Little*, "[t]he fraud is the false certification of patients as [needing DME or genetic tests]." *Id.* Dr. Young's "certifications [that patients need DME or genetic tests] . . . are false because Dr. [Young] did not know whether the patients were eligible for [DME or genetic tests], but he lent his signature to attest to Medicare that they were." *Id.*

_____

[1] Even if Sunrise lied to Dr. Young about whether health care workers performed exams on the patients, jurors heard testimony that Momentum did not lie to Dr. Young. At trial, Powell testified that he never told Dr. Young that medical professionals had contacted the patients. To rebut Powell's testimony, Dr. Young produced documents from Momentum indicating that the first step in its treatment plan was to talk with "our medical assistants or physician's assistants." Dr. Young produced Momentum's initial offer letter, which assured him that "[a]ll of the intake is already complete." In the face of this conflicting evidence, the jury was free to believe Powell instead of Dr. Young, because "[t]he jury 'retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses.'" *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (quoting *United States v. Loe,* 262 F.3d 427, 432 (5th Cir. 2001)).

The jury heard enough evidence to infer that Dr. Young entered into a "silent and informal" agreement, and the jury can use the "surrounding circumstances" to infer that Dr. Young had knowledge of the fraudulent activity. *Barson*, 845 F.3d at 163–64.

First, the jury was entitled to rely on the extraordinary volume of prescriptions signed by Dr. Young to infer that he had an agreement with Sunrise, Expansion, and Momentum to commit health care fraud. Dr. Young was able to sign a high volume of prescriptions because he was not actually calling the patients to perform telehealth evaluations. Momentum's records indicated that Dr. Young signed two or three prescriptions per minute, which implied that Dr. Young was not having any conversations with patients. Powell was concerned that Dr. Young's speed in signing the prescriptions "looked shady." Apparently, the jury rejected Dr. Young's implausible explanation that he called the patients and then processed the charts later. Dr. Young's performance at Sunrise was similar, and he would sign 25 prescriptions in 20 to 30 minutes. Dr. Young's prescription volume caused him to become the fifth-highest prescriber of orthotic braces and the seventh-highest prescriber of the relevant genetic tests for Medicare patients nationwide. The testimony of Dr. Magliocco, a prosecution expert witness, supported an inference that these high numbers of prescriptions are evidence of fraud. As a doctor who treated cancer patients, Dr. Magliocco testified that in his practice it would take him "several years" to prescribe the same number of genetic tests that Dr. Young ordered in just one month. The jury was entitled to find that Dr. Young's prescription of "an unusually high number" of genetic tests was evidence of a conspiracy to commit fraud. *United States v. Brown*, 354 F. App'x 216, 222 (5th Cir. 2009) (citing *United States v. Achobe*, 560 F.3d 259, 264 (5th Cir. 2008) (recognizing that a high quantity of narcotics prescriptions is evidence that a defendant operated a pill mill)).

Second, the fact that Dr. Young gave his login credentials to his co-conspirators suggests a conspiratorial agreement. Turning over his login information to Sunrise and Expansion allowed their employees to pre-fill information into the prescriptions. The pre-filled prescriptions selected diagnoses for the patient and selected what kind of braces the patient would receive. Dr. Young gave his login credentials to Pamela Edwin, the General Manager of Sunrise. Edwin never told Dr. Young that she was a medical professional.

Third, the jury heard that Dr. Young contravened standard medical practice. A medically unnecessary prescription is evidence of fraud, especially when a prescription is so overbroad that no individual could ever use all of the braces prescribed. *United States v. Turner*, 561 F. App'x 312, 315 (5th Cir. 2014). Dr. Young wrote prescriptions for multiple braces that were incompatible with each other. Dr. Hoover, a prosecution expert in orthotic braces, testified that six of Dr. Young's prescriptions were not medically reasonable, as it was physically impossible for some of the braces to be worn concurrently. Dr. Hoover also testified that even if Dr. Young believed that the information in the charts was accurate, the charts did not provide enough information for him to determine that braces were medically necessary. Additionally, Dr. Young's genetic testing orders contravened standard medical practice. Dr. Magliocco testified that it is not normal for a doctor to sign a prescription for a genetic test after the genetic sample had already been collected from the patient. Further, Dr. Magliocco testified that some of Dr. Young's orders for genetic testing were not medically necessary even if all of the information in the charts was true, because the charts were missing key details.

Fourth, the jury heard that Dr. Young encouraged Sunrise to expand its business into (fraudulent) genetic testing. After Sunrise was raided by law enforcement for DME fraud, it started searching for other telehealth

opportunities that could still be viable.  Around the same time, Dr. Young talked with Sunrise about potentially expanding into genetic testing. Furthering this goal, he emailed Sunrise billing codes used for genetic testing and an example of a completed prescription for genetic testing.  Edwin testified that Kahn and Dr. Young were thinking about shifting Sunrise to cancer testing using the same fraudulent practices they had used for DME braces, and Dr. Young would sign prescriptions that were already pre-filled by Sunrise's non-medical staff.

Fifth, Dr. Young was paid significant amounts of money for little medical work: $260,000 by Sunrise, $142,000 by Expansion, and $78,000 by Momentum.  Being paid a large sum of money for an insignificant amount of work is circumstantial evidence of fraud.  *Barson*, 845 F.3d at 164.

Sixth, the doctor continued to sign prescriptions despite learning of red flags suggesting fraud.  Dr. Young received a phone call from a patient's relative threatening to turn him into the Arkansas Attorney General's Office for "fraud" because the patient received a brace that "she did not order or request."  After Dr. Young talked to the patient's relative, she never reported him to law enforcement.  Dr. Young's wife then used his email to ask Richardson how Dr. Young is "protected from thing[s] like this from Expansion Media LLC."  Later, Dr. Young received an email from another doctor who was being investigated by Medicare for similar conduct.  He wrote to inform Dr. Young and other doctors that "Medicare patients must have a face-to-face evaluation before they can be legally issued" a prescription for both DME and medication.  Dr. Young then emailed Richardson asking, "[H]ow am I protected?"  Heedless of such red flags, Dr. Young continued to sign a mass of prescriptions.

In light of this evidence, the court is unpersuaded that "no rational jury 'could have found the essential elements of the offense to be satisfied

beyond a reasonable doubt.'" *Ganji*, 880 F.3d at 767 (quoting *Bowen*, 818 F.3d at 186).[2]

## 2. False Statements

To sustain "a conviction for making false statements related to healthcare matters" under 18 U.S.C. § 1035, "the [g]overnment must prove beyond a reasonable doubt that '(1) the defendant made a materially false, fictitious, or fraudulent statement or misrepresentation; (2) in connection with the delivery of [or payment for] health care benefits; and (3) []he did so knowingly and willfully.'" *Hamilton*, 37 F.4th at 260 (quoting *United States v. Dailey*, 868 F.3d 322, 330 (5th Cir. 2017)). Dr. Young disputes the third element and argues an absence of evidence that he knowingly and willfully made false statements because he did not know the information in the documents was inaccurate.

The documents involved in each count contained multiple false assertions indicating that Dr. Young had evaluated and talked with each patient. For one patient, Dr. Young's letter of medical necessity stated, "Upon completion of my discussion with [the patient] and the evaluation of her condition, I have determined that an orthotic will benefit the patient." Dr. Young's letter goes on to say that he "discussed patient compliance" with the patient and "instructed [the patient] to utilize the back orthosis

---

[2] Dr. Young argues that this case is similar to *Ganji* because both cases involved schemes where the doctor did not directly interact with patients and relied on faulty information that was provided to them by others. However, *Ganji* can be distinguished from this case. In *Ganji*, no witness "could provide direct evidence of their alleged co-conspirator's actions because the witnesses never acted with the defendants to commit the specific charged conduct." 880 F.3d at 766. Here, the jury heard testimony from Richardson, Powell, Edwin, and Kahn about how Dr. Young's actions enabled their criminal conspiracy. In the face of this testimony, there is sufficient evidence to sustain Dr. Young's criminal convictions.

daily, as needed." Additionally, the letter purports to report test results and observations that could only be gained from an actual examination of the patient. The letter concludes with this guarantee: "I, David Young, MD, do hereby attest that the above information is true, accurate and complete to the best of my knowledge. I hereby affirm this documentation as part of this patient's medical record. [Electronically signed by David Young, MD]." The attestations involved in the other false statement counts contain similar language. Two of the prescriptions that were charged as false statements included braces that could not be worn concurrently.

Dr. Young's attempt to rebut this evidence fails. He concedes that the charts contained false statements, but he argues that the government did not prove that he knew the statements were false. Yet the very text of the statements rebuts this argument. The letters of medical necessity contain statements that Dr. Young had talked to the patients and "discussed patient compliance." At the time he signed the letters, Dr. Young would have known whether he had actually talked with the patients to discuss patient compliance. Dr. Young admits that he had not talked to these patients. And contrary testimony indicated that these patients had never spoken to Dr. Young.

Dr. Young's answer to this discrepancy is that the software he used auto-generated language after he had signed the charts. However, evidence at trial demonstrated that the software platform required doctors to view an entire prescription before signing it. Faced with this conflicting evidence, the "jury was entitled to discount [Dr. Young's] testimony." *Hamilton*, 37 F.4th at 261. The jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *Loe*, 262 F.3d at 432. The evidence was sufficient to convict on the false statement counts.

## B. Venue

The court reviews the denial of a motion for judgment of acquittal based on a venue challenge *de novo*. *United States v. Garcia Mendoza*, 587 F.3d 682, 686 (5th Cir. 2009). This court "will affirm a verdict if, viewing all the evidence in the light most favorable to the government, a rational jury could conclude, from the evidence presented at trial, that the government established venue by a preponderance of the evidence." *Id.*

Dr. Young either waived or forfeited his venue challenge because he failed to timely object. "A defendant 'must assert a challenge to venue prior to trial if the indictment or circumstances known to the defendant make such a challenge apparent.'" *United States v. Plezia*, 115 F.4th 379, 393 (5th Cir. 2024) (quoting *United States v. Rodriguez-Lopez*, 756 F.3d 422, 430 (5th Cir. 2014)); *see also* Fed. R. Crim. P. 12(b)(3) (a defense alleging "improper venue" "must be raised by pretrial motion if the basis for the motion is then reasonably available"). "If a venue challenge is not apparent before trial, a defendant must bring a claim of improper venue to the district court's attention at the close of the United States' evidence." *Rodriguez-Lopez*, 756 F.4th at 430. When a defendant knows of the facts underlying a charge before trial, his failure to object to venue constitutes a waiver. *United States v. Delgado-Nunez*, 295 F.3d 494, 496–97 (5th Cir. 2002). To allow a defendant to wait until after a verdict to raise a venue challenge for the first time "would create severe perverse incentives" and allow a defendant "to game the system and obtain a free second shot at an acquittal by waiting for his trial to conclude and then challenging venue in the event of a conviction." *Id.* at 497.

Dr. Young failed to raise a Rule 12(b)(3) venue motion before trial, failed to raise venue in his motion for a judgment of acquittal at the close of the government's case, and failed to raise venue in his motion for a judgment of acquittal at the close of evidence. The only time Dr. Young raised the issue

of venue before the jury returned its verdict was in a proposed jury instruction on venue. However, merely offering a proposed jury instruction on venue does not preserve a venue claim. *United States v. Stewart*, 843 F. App'x 600, 603–04 (5th Cir. 2021).

Dr. Young could have raised venue at the appropriate times, but he failed to do so. Dr. Young knew of the facts underlying the conspiracy charge before trial. He knew that he was facing trial in the Northern District of Texas even though he lived and worked in Fredericksburg, located in the Western District. He knew that the government's theory of the conspiracy charge was that he signed prescriptions for DME and genetic testing. He knew that he typically wrote these prescriptions at work and frequently brought his laptop to work to fill out prescriptions. The indictment informed him that his co-conspirators resided in Florida and Georgia. Armed with this information before trial, Dr. Young had no excuse for failing to timely object to venue as to his conspiracy charge.

Additionally, Dr. Young knew the facts underlying the false statements charges before trial because the indictment included the initials of the Medicare beneficiaries and the dates Dr. Young created the medical records and written orders. Dr. Young could readily ascertain where he created these documents on the specified dates. Because he "certainly had enough 'notice of a defect of venue' to be able to assert, before trial, the same claim he now raises on appeal," Dr. Young's venue argument is waived. *Delgado-Nunez*, 295 F.3d at 497 (quoting *United States v. Black Cloud*, 590 F.2d 270, 272 (8th Cir. 1979)).[3]

---

[3] Even if it be construed as "forfeited," and subject to our plain error review, and even if there were plain error in the government's venue choice, we find no prejudice because of Dr. Young's obvious failure to raise the issue at every permissible juncture before and during trial.

## C. Evidentiary Objections

"Properly preserved evidentiary objections are reviewed for an abuse of discretion." *United States v. Curtis*, 635 F.3d 704, 716 (5th Cir. 2011). "A district court's ruling as to Rule 403 is reviewed 'with an especially high level of deference to the district court, with reversal called for only rarely and only when there has been a clear abuse of discretion.'" *United States v. Sims*, 11 F.4th 315, 323 (5th Cir. 2021) (quoting *United States v. Dillon*, 532 F.3d 379, 387 (5th Cir. 2008)). Any error in admitting evidence under Federal Rule of Evidence 403 "is subject to harmless error review, and reversal is not required unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction." *Sims*, 11 F.4th at 323 (quoting *United States v. Williams*, 620 F.3d 483, 492 (5th Cir. 2010)).

Dr. Young argues that the district court abused its discretion by allowing Dr. Craig and Dr. Haas to testify to their belief that Sunrise was engaged in fraud. Dr. Haas's actions were similar to Dr. Young's. Dr. Haas pled guilty to conspiracy to commit health care fraud and testified about the red flags she saw in Sunrise's business model. Dr. Craig considered working for Sunrise, but he determined that it was a fraudulent company and reported it to law enforcement.

The district court allowed these physicians to testify because their testimony was relevant to "their experiences with Sunrise Medical and the warning signs of fraud they saw." Dr. Young argues that their opinions are irrelevant because they do not illuminate Dr. Young's personal knowledge, and their admission is particularly unfair because the court simultaneously precluded him from introducing evidence about other doctors who were not charged with a crime even though they engaged in the same conduct. His position is in error. It is permissible for a witness to testify about his own experiences and relay what he thought about a fraudulent scheme that he

observed. *See United States v. Bowling*, 952 F.3d 861, 868 (7th Cir. 2020) (permitting a witness to testify that she believed that an email sent to her and the defendant was fraudulent); *United States v. Kozeny*, 667 F.3d 122, 134 (2d Cir. 2011) (using witnesses' "testimony to demonstrate that others with access to the same sources of information available to [the defendant] were able to figure out [the fraudulent] scheme and avoid participating.").

But even if the district court abused its discretion in admitting this testimony, the error was harmless. Where other evidence against a defendant is "substantial," an evidentiary error of this nature is harmless. *Williams*, 620 F.3d at 493; *see also United States v. Mendoza-Medina*, 346 F.3d 121, 129 (5th Cir. 2003). As has been explained, the government introduced more than enough evidence to establish Dr. Young's guilt irrespective of what these doctors had to say.

## D. Multiple Conspiracies Instruction

"[A] district court's refusal to give a requested jury instruction" is reviewed "for abuse of discretion." *United States v. Hagen*, 60 F.4th 932, 946 (5th Cir. 2023). "The district court abuses its discretion by refusing to include a requested instruction only if that instruction: (1) is substantively correct; (2) is not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense." *Id.* (quoting *United States v. Simkanin*, 420 F.3d 397, 410 (5th Cir. 2005)). Failure to give a requested jury instruction "is subject to harmless error review." *United States v. Aldawsari*, 740 F.3d 1015, 1019 (5th Cir. 2014). The court "will not reverse if [it] determine[s], based on the entire record, that the challenged instruction could not have affected the outcome of the case." *United States v. Nguyen*, 493 F.3d 613, 623 (5th Cir. 2007) (quoting *Johnson v. Sawyer*, 120 F.3d 1307, 1315 (5th Cir. 1997)).

No. 25-10234

Dr. Young admits that Sunrise, Expansion, and Momentum were all involved in some kind of Medicare fraud. However, because the companies had no connection with each other, Dr. Young asserts that the government failed to prove the overarching conspiracy charged in the indictment. Dr. Young argues that, at best, the government proved the existence of three separate conspiracies between Dr. Young and Sunrise, Dr. Young and Expansion, and Dr. Young and Momentum.

"This court will affirm a 'jury's finding that the government proved a single conspiracy unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt.'" *United States v. Shah*, 95 F.4th 328, 361 (5th Cir. 2024) (quoting *United States v. Beacham*, 774 F.3d 267, 273 (5th Cir. 2014)). The jury found that the government proved a single conspiracy existed in this case. During closing argument, the government told the jury that it had no evidence that Sunrise, Expansion, and Momentum worked together, but it urged the jury to find that Dr. Young was the one who was connected to all of the different conspirators, because without his signature, none of the companies could sell their prescriptions or make any profit. Indeed, this is the exact model of conspiracy that Dr. Young diagrams in his appellate brief: he is the hub that is connected to Sunrise, Momentum, and Expansion via separate spokes.

To determine whether one conspiracy exists, this court considers: "(1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the various dealings." *Shah*, 95 F.4th at 361 (quoting *Beacham*, 774 F.3d at 273). A common goal is interpreted "broadly," and a common goal exists when the goal of the conspiracy is "personal gain." *Id.* The jury could have found that the common goal of the conspirators was to make money by submitting fraudulent claims to Medicare; the nature of the scheme was to submit claims to Medicare

without examining patients; and that the overlap in the scheme was Dr. Young's essential participation by signing each fraudulent prescription. Given these facts, this court cannot hold that no reasonable jury could find that there was one overarching conspiracy.

Even if the district court erred, it was harmless error. Dr. Young concedes as much, admitting in his reply brief that an error in the jury instructions, standing alone, "would not warrant reversal of this conviction." This concession is in line with this court's precedent. "Even where the evidence points to multiple conspiracies rather than the single conspiracy charged in the indictment, the variance does not affect the defendant's substantial rights as long as the government establishes the defendant's involvement in at least one of the proved conspiracies." *United States v. Mitchell*, 484 F.3d 762, 770 (5th Cir. 2007).

This circuit's precedent also recognizes that the multiple conspiracies instruction is primarily appropriate in cases with multiple defendants charged "with one . . . overall conspiracy, but the proof at trial indicates that some of the defendants were *only* involved in separate conspiracies *unrelated* to the overall conspiracy charged in the indictment." *Bowen*, 818 F.3d at 188–89 (quoting *United States v. Castaneda–Cantu*, 20 F.3d 1325, 1333 (5th Cir.1994)); *see also* Fifth Circuit Pattern Jury Instructions (Criminal Cases), No. 2.16, Note. Because Dr. Young was the single defendant, there was no risk of spillover evidence or jury confusion about a separate conspiracy that Dr. Young was not involved in. Other circuits have refused to overturn a conviction for this type of alleged instructional error when only one defendant is on trial. *See United States v. Richardson*, 532 F.3d 1279, 1291 (11th Cir. 2008); *United States v. Corey*, 566 F.2d 429, 431 n.3 (2d Cir. 1977).

E. Sentencing

This court "review[s] the district court's interpretation of the Sentencing Guidelines de novo and its findings of fact for clear error." *United States v. Aderinoye*, 33 F.4th 751, 754 (5th Cir. 2022).

Dr. Young argues that the district court erred in using the amount billed to Medicare as the loss amount for sentencing purposes. Dr. Young contends that the government failed to prove that he was aware of the bills that his co-conspirators sent to Medicare because he was not involved in processing the billing.

The Sentencing Guidelines define loss as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1) & note(A) (2024). This court has routinely applied that standard. *United States v. Rao*, 123 F.4th 270, 283 (5th Cir. 2024). In the health care fraud context, "the amount fraudulently billed to Medicare/Medicaid is 'prima facie evidence of the amount of loss [the defendant] intended to cause.'" *United States v. Isiwele*, 635 F.3d 196, 203 (5th Cir. 2011) (quoting *United States v. Miller*, 316 F.3d 495, 504 (4th Cir. 2003)). However, both "parties may introduce additional evidence to suggest that the amount billed either exaggerates or understates the billing party's intent." *Id.* (quoting *Miller*, 316 F.3d at 504).

Dr. Young introduced evidence that he was not involved in billing and was unaware of the amount that his co-conspirators billed to Medicare. He also argued that the billed amounts are irrelevant because Medicare pays DME and genetic testing claims based on a set fee schedule. This evidence does not demonstrate that the district court clearly erred in calculating the loss amount. Even when a doctor is unaware of the billed amount and does "not submit the bills personally" to Medicare, the district court does not err in determining that the billed amount is the intended loss amount. *Rao*, 123 F.4th at 284. Moreover, evidence that a government benefit program uses a

"fixed payment schedule" is not sufficient to reduce the intended loss amount. *Id.* "[T]his court has upheld district courts' use of billed amounts to measure intended loss where, as here, the defendant[] failed to proffer evidence addressing [his] subjective intent." *Id.* The only evidence of Dr. Young's subjective intent was his ignorance of how much his co-conspirators billed Medicare. That his co-conspirators would submit bills to Medicare as a result of his actions was of course foreseeable, however. Because it has long been held that a "district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy," the district court did not clearly err in calculating the loss amount. *United States v. Moran*, 778 F.3d 942, 974 (11th Cir. 2015).

Finally, Dr. Young urges that the loss amount should not include prescriptions signed before February 2019 because the jury never made a factual determination that he was involved in the conspiracy before February 2019. Dr. Young cites no law supporting his argument, and the evidence plainly shows that he participated in the DME activities well prior to that. The jury convicted him of the conspiracy charge alleged in the indictment, which indicated that Dr. Young entered into the conspiracy in or around August 2016.

### III.

Dr. Young's conviction and sentence are AFFIRMED.